No. 2--06--0144    Filed: 3-27-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--3507 |
| MICHAEL P. CARDAMONE, | ) ) ) | Honorable Michael J. Burke, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CALLUM delivered the opinion of the court:

I. INTRODUCTION

Defendant, Michael P. Cardamone, a gymnastics coach, was charged with predatory criminal sexual assault of a child (720 ILCS 5/12--14.1(a)(1) (West 2002)) (8 counts) and aggravated criminal sexual abuse (720 ILCS 5/12--16(c)(1)(I) (West 2002)) (18 counts) against 14 gymnasts at the American Institute of Gymnastics (gym) in Aurora. Defendant's jury trial lasted approximately two months, included more than 100 witnesses for the defense, and generated over 10,000 pages of hearing transcripts. After deliberating for three days, the jury found defendant guilty of nine counts of aggravated criminal sexual abuse against seven girls. The trial court denied defendant's posttrial motions and sentenced him to 20 years' imprisonment.

Defendant appeals, arguing that: (1) the trial court erred in admitting evidence of uncharged misconduct against the complainants; (2) the trial court erred in admitting evidence of uncharged

misconduct against a girl at another gymnastics club; (3) the trial court erred in refusing defendant's unanimity instruction; (4) the trial court abused its discretion in excluding expert witness testimony regarding the complainants' statements' reliability in light of suggestive interview techniques; (5) the trial court abused its discretion in refusing to instruct the jury on the lesser included offense of battery; (6) the trial court erred in barring defendant's videotape of the gym's facility, not allowing the jury to visit the facility, and allowing the State's videotape and photographs of the facility both into evidence and inside jury deliberations; (7) the State failed to prove defendant's guilt beyond a reasonable doubt; and (8) the trial court abused its discretion during sentencing by considering defendant's failure to admit guilt instead of his rehabilitative potential. For the following reasons, we agree with defendant's arguments regarding the improper admission of uncharged conduct, the refusal of the unanimity instruction, and the exclusion of expert witness testimony. Accordingly, we reverse and remand the cause for a new trial.

## II. BACKGROUND

### A. State's Case

All of the acts defendant allegedly committed, except for one, occurred at the gym, which is owned and run by defendant's family. The gym's main area resembles a large, open warehouse and is filled with gymnastics equipment, including a foam pit, mats, uneven bars, balance beams, vaults, and a floor exercise area. The square floor exercise area is in the center of the room and is bordered by an area with several sets of uneven bars on one side, vaulting runways, vaults, and a tumble track on the second side, an area with several balance beams and windows on the third side, and an open area in front of the fourth side. The foam pit, a large pit filled with big, square, blocks of soft foam, is located in the corner between the uneven bars and some of the vaults. On the opposite side of the

gym, in the corner between the balance beams and the other vaults, is a storage area. There are no walls or other barriers dividing the gym's main area. Smaller rooms, adjoined by a hallway, are located outside the gym's main area. Those rooms are preschool rooms, which are referred to as the "house room" and the "castle room," and a music room. Gymnastics, preschool, and cheerleading classes are conducted during business hours.

The 14 complainants were gymnastics students at the gym. Complainant C.E. made allegations against defendant in November 2002, and the remaining allegations followed. All the conduct, charged and uncharged, allegedly occurred during a three-year time period, between 1999 and 2002. Of the 26 counts charged, defendant was convicted of 9 counts of misconduct, against complainants A.P., A.S. (2 counts), B.P. (2 counts), S.H., N.E., S.O., and C.E. The charges and the testimony of these complainants, in the order that they appeared at trial, follow.

### 1.  Complainant A.P.

Defendant was charged with predatory criminal sexual assault against A.P. for penetrating her sex organ with his finger and aggravated criminal sexual abuse for touching A.P.'s sex organ for the purpose of sexual gratification. According to the charges, the two counts represented alternative theories relating to the same act, which occurred sometime between December 2000 and March 2002, while A.P. stretched against a mat by a vault.

At trial, A.P. testified first to the conduct that was the subject of the charges. A.P. began attending classes at the gym when she was 6 or 7 years old and continued there until she was 10 years old, in 2002. Defendant was her primary coach when she began; he coached her less with each passing year. Around December 2001, defendant assisted A.P. with a straddle stretch. He leaned a mat against a vault. A.P. lay down on the floor, with her head towards a wall and her legs and

bottom against the mat. She spread her legs and defendant, kneeling, placed one hand on each of her thighs and pressed down to stretch her. He then moved his hands closer to her vagina and slid his finger beneath her leotard, touching her vagina. He felt around and put his finger inside her vagina to the end of his fingernail--approximately half an inch. After sliding his finger under her leotard and inserting his finger inside her vagina, defendant kept his finger there for two seconds.

The assistant State's Attorney notified the trial judge that A.P. was going to discuss additional conduct. The trial judge told the jury that evidence would be presented that defendant was involved in offenses other than those charged in the indictment and that the evidence was to be received on the issues of defendant's intent, absence of innocent mental state, course of conduct to corroborate the victim's testimony concerning the charged offense, and "for its bearing on any matter to which it is relevant."[1]

As to uncharged conduct, A.P. testified that defendant had touched her inappropriately, the same way and inside her vagina, 40 to 50 other times. Defendant penetrated her vagina every year that she took classes at the gym, but the number of times decreased each year. A.P. testified that this behavior always occurred in the same location of the gym. Although she first testified that he had touched her 40 to 50 times, A.P. later estimated that, by the time she left the gym, defendant had touched her inappropriately over 100 times.

A.P. acknowledged that the gym was very crowded. She testified that, when the incidents occurred, as many as 100 to 200 other people were present in the gym, many within a matter of feet

---

[1] This instruction was repeated each time a subsequent complainant testified about uncharged conduct.

from her. Other girls were in lines, vaulting past her, from both directions. A.P. did not object to being stretched by defendant, nor did she complain to anyone. She testified that she did not complain to defendant, tell him to stop, or flinch and try to get away. A.P. knew what inappropriate touching was and testified that, whenever she went by the vault to stretch, she knew that defendant was going to insert his finger in her vagina. A.P. testified that, every time defendant stretched her, he put his finger inside her vagina; he never did the stretch without doing so. She continued to go to him to stretch. A.P. testified that other gymnasts also went behind the mat to be stretched by defendant. A.P. never looked to see if defendant was doing the same thing to them that he did to her.

A.P. testified that she left the gym in 2002 because the training and conditioning were too difficult. After she left the gym, A.P.'s mother asked her whether defendant had ever touched her inappropriately. A.P. testified that she told her mother no, that he had not touched her, because she did not want to get involved and did not want everyone at the gym to hate her. Her mother gave her an affidavit that stated, "[d]efendant never touched me in an offensive or inappropriate or sexual manner, nor did I ever see him touch any other gymnast in an inappropriate or sexual manner." A.P. signed the affidavit on May 1, 2003, but testified that in it she was not telling the truth. A.P. explained that her mother was one of defendant's ardent supporters, which made it hard to tell the truth.

Later, in April 2004, A.P.'s mother again asked whether anything had happened between A.P. and defendant. A.P. cried and told her mother that defendant had touched her. A.P. knew some of the other complainants and looked up to them as superior gymnasts. The other complainants were in a different training group, and A.P. was not in their "clique." She did not discuss the allegations

against defendant with those girls because she had already left the gym before the allegations started. A.P. was not present at a November 2002 sleepover held by complainant B.P.

The jury found defendant not guilty of penetrating A.P.'s sex organ with his finger. However, it did find him guilty of touching A.P.'s sex organ for the purpose of sexual gratification.

### 2. Complainant A.S.

Defendant was charged with predatory criminal sexual assault against A.S. for penetrating her sex organ with his finger and aggravated criminal sexual abuse for touching A.S.'s sex organ for the purpose of sexual gratification. The act allegedly occurred in the summer of 2000, during straddle stretches near a vault. In addition, defendant was charged with aggravated criminal sexual abuse for touching A.S.'s breast in the summer of 2001, during uneven bar exercises.

At trial, A.S. testified that she began gymnastics at the gym when she was three years old. She left the gym about 10 years later, in September 2002. During A.S.'s last few years at the gym, defendant was her main coach. About 10 to 15 girls were in her training group; several girls from the group ultimately became complainants. She knows all of the complainants, and most of them are her friends. They attended sleepovers together, talked on the telephone, and wrote online to each other.

As to the first charged incident, A.S. testified that, in the summer of 2000, while assisting her with a sitting middle split, defendant's right hand moved from the back of her thigh near her hip bone, over her leg, and under her leotard. Defendant touched her vagina under her leotard, moved his hand around, and then inserted one of his fingers about one inch inside her vagina for 10 to 20 seconds. A.S. was stretching at the back of the gym, by the storage area and a vault, when the

incident occurred. A.S. was against a mat during the stretch; some teammates were stretching on the other side of the mat, but no one was next to her.

A.S. testified to a second charged incident. In the summer of 2001, she was working on her uneven bars routine on a bar that was placed over the foam pit. Defendant was standing on a mat, assisting A.S. as she performed a particular skill. A.S. dismounted the bar into the pit; defendant either fell in or jumped in after her. A.S. was immersed in the pit. Defendant, on her right side, started tickling her on her stomach. He then put his hand through the arm hole of her leotard (near her underarm) and started touching her right breast with his fingers and his palm for 10 to 30 seconds. A.S. reacted by biting defendant's forearm. Defendant's mother, the gym's owner, yelled at A.S. that, if she ever bit defendant again, she would be kicked out of the gym. A.S. did not tell defendant's mother why she bit defendant.

Next, A.S. testified to three categories of uncharged conduct. First, A.S. testified that, in the summer of 2000, defendant touched her vagina, during stretches and by the vault, between 2 and 10 times. Each time, defendant would put his finger inside her vagina. A.S. never said anything to defendant; he never said anything to her.

Second, A.S. testified that, in the summer of 2000, defendant assisted her while she performed wheel conditioning and low bar exercises near the uneven bars and a vault. Defendant placed his right hand on her shoulder and his left hand under her thigh. His left hand moved underneath her leotard to touch her vagina, and he inserted his finger one inch inside her vagina for 10 to 20 seconds. There was no one next to her at the time. A.S. estimated that defendant did this between 5 and 15 times that summer. She did not tell any adults about what defendant had done.

Third, A.S. testified that in the pit defendant had touched her breast prior to the incident where she bit him. The circumstances were the same, i.e., after completing a skill and landing in the pit, defendant tickled her and put his hand underneath her leotard. A.S. estimated that defendant had touched her breast 5 to 10 times and that she had bit him before--5 times at the most.

A.S. went to B.P.'s sleepover on November 23, 2002. At that party, there was a general discussion amongst a number of girls about being touched by defendant. There, A.S. said that she was touched under her bra strap. When interviewed in January 2003, two years after the alleged incidents with defendant, A.S. was asked how many times defendant touched her in an inappropriate way. She responded "not a whole lot." At that time, she stated that defendant touched her crotch area "maybe two times" and, when asked whether defendant touched her outside or inside her vaginal area, she responded "outside." The State and defendant stipulated that the first person to use the word "vagina" was an investigator, in January 2003; A.S. never used that word until after it was used by the investigator. In addition, when interviewed in January 2003, A.S. did not mention the wheel or low bar conditioning incidents because she had not done the exercises in two years and did not remember the incidents. At trial, A.S. estimated that defendant touched her inappropriately "probably about 30 times" and estimated that defendant put his finger inside her vagina about 20 times, between 2 and 10 of those times during straddle stretches.

A.S. testified that she did not leave the gym in September 2002 because she was having trouble with defendant. Rather, she left the gym because she did not get along with defendant's wife, Elizabeth (Liz) Cardamone, who was also a coach at the gym. A.S. agreed that the gym was quite active and that there could be 100 to 200 people at the gym on a normal day, including Liz. A.S. did not see defendant inappropriately touch anyone else.

The jury found defendant not guilty of penetrating A.S.'s sex organ with his finger. However, it found him guilty of touching A.S.'s sex organ and breast for the purpose of sexual gratification.

### 3. Complainant B.P.

Defendant was charged with two counts of aggravated criminal sexual abuse against B.P. for: (1) touching her sex organ in December 2001, during straddle stretches by a vault; and (2) touching her breast in December 2001, during an arch stretch near the tumble track and floor exercise area, for the purpose of sexual gratification.

At trial, B.P. testified that she began gymnastics at the gym when she was four years old. She left the gym in November 2002. Regarding the charged conduct, B.P. testified that in December 2001, she was performing an arch stretch that required her to lie on her side with her hands above her head, arch her back to bring her legs behind her, and touch her feet to her head. B.P. performed this stretch by the floor exercise area, in between the floor and the tumble track. While B.P. stretched, defendant kneeled behind her with one hand on her knee and the other near her underarm. As defendant pushed her legs towards her head, he slid his hand from her underarm, underneath the seam of her leotard and bra, and onto her breast. His fingers moved about one inch past the seam line; his fingers did not touch her nipple area. He did not squeeze, grab, rub, or perform any similar motions. B.P. pretended that the stretch was too hard on her back, and she told defendant to stop. Her other teammates were working on jumps and tumbling nearby.

B.P. testified to a second charged incident. In December 2001, B.P. performed a sitting straddle stretch on a mat between a wall and the floor exercise area, near the vaulting area. She usually had assistance during the stretch, to straddle her legs flush against the mat. On this occasion, defendant lay on his stomach on the ground behind her, with his elbows on the ground, and placed

his hands on her hips to push her towards the mat. As he pushed her farther into the mat, defendant slid his hands down her leg, towards her bottom, and underneath her leotard. His fingers touched her vagina, but did not penetrate. Rather, his hands touched the skin surrounding her vaginal opening.

Next, B.P. testified to two categories of uncharged conduct. First, B.P. testified that, during the 2001-02 competitive season, she performed the arch stretch numerous times, and defendant touched her breast "around seven or ten, maybe, more or less" times. There were occasions where defendant would assist her with the stretch and not touch her breast.

Second, B.P. testified that defendant touched her vaginal area during stretches on about 10 occasions. She told defendant to stop the stretch because her legs hurt. She did not tell an adult that defendant touched her, because she had many friends at the gym and did not want to leave them. B.P. testified that she never saw defendant inappropriately touch other girls. She was at the gym five days a week for five hours per day.

On November 23, 2002, B.P. hosted a sleepover at her house for her birthday. Approximately 20 girls from the gym were present. At the party, there was discussion about allegations coming forth from C.E. (the first girl to publicly accuse defendant) about being inappropriately touched by defendant. At the party, B.P. said that defendant had also touched her, but she was not specific about the touching.

The jury found defendant guilty of touching B.P.'s sex organ and breast for the purpose of sexual gratification.

### 4. Complainant S.H.

Defendant was charged with predatory criminal sexual assault against S.H. for penetrating her sex organ with his finger and with aggravated criminal sexual abuse for touching S.H.'s sex organ for the purpose of sexual gratification. According to the charges, the two counts represented alternative theories relating to the same act, which occurred sometime in the summer of 2001, while S.H. was in the gym's foam pit.

As to the charged conduct, S.H. testified that, in the summer of 2001, she was learning a new skill on the vault that required her to land in the foam pit. Defendant jumped into the pit after S.H. landed and began tickling her stomach. S.H. was covered up to her waist with the pit foam. Defendant slid his hand underneath her leotard and touched his finger to her vagina. Defendant put his finger inside her vagina; he also touched the skin surrounding her vaginal opening. There was no one waiting to perform a vault or standing around the pit.

Next, S.H. testified to five categories of uncharged conduct. First, she testified that, on another occasion, she landed in the foam pit after performing an uneven bars skill. Defendant jumped into the pit and tickled and touched her. He touched her vagina underneath her leotard with his hand. S.H. could not remember whether defendant touched the inside of her vagina during this incident. On cross-examination, she added that defendant jumped into the pit after her vault exercise on yet another occasion and that defendant inappropriately touched her in the pit on two or three occasions.

Second, S.H. recalled pulling her hamstring in April 2001. She testified that, on two occasions, once by the vault and once by the uneven bars, defendant massaged her hamstring while she was lying on her stomach. He used both hands to massage S.H. and then slid his hand up and put his fingertip inside her vagina. When defendant touched her vagina, S.H. told him that it was

time to use the Icy Hot, because she wanted him to stop. The second time this occurred, teammate N.E. was a couple of feet in front of S.H. N.E. "gave [S.H.] a look."

Third, S.H. testified that defendant touched her vagina during a straddle stretch. S.H. was stretching in the area between the vaults and the balance beams. Defendant placed his hands on her upper thigh to push her towards the mat. His hands went under her bottom and he touched her vagina with his finger. His finger did not go inside her vaginal opening. This occurred one or two times. When defendant touched her, S.H. said, "[l]et's go to the next event."

Fourth, S.H. testified that defendant assisted her while she performed wheel conditioning--a core conditioning skill performed by holding with both hands a small wheel with handles and rolling forward and backward. This skill was usually practiced by the uneven bars and the vault runway. Defendant placed one hand on S.H.'s stomach and the other on her legs. He moved the hand that was on her legs up to her crotch and vagina. He touched her vagina underneath her leotard with his finger. His finger did not go inside her vagina. S.H. testified that defendant touched her twice during wheel exercises.

Fifth, S.H. testified that defendant touched her vagina while spotting her on a press handstand. S.H. and S.O. were both doing press handstands near the vault and foam pit. S.H. testified that she told S.O. what defendant had done. According to S.H., S.O. responded, "[y]ou have to tell him." S.H. refused and did not want S.O. to say anything. S.O. called defendant over, and S.O., defendant, and S.H. had a conversation. S.H. could not recall exactly what S.O. said to defendant. Defendant responded, "It sometimes slips. It's an accident. You have to tell me when it happens." S.H. was angry that S.O. said anything to defendant, because she did not want him or anybody to know.

S.H. summarized at trial that, in her seven years at the gym, defendant touched her vaginal area "not more than 10" times. Of those times, his finger went inside her three times. She agreed that the gym was busy and that, on any given day, there could be 100 to 200 people present, including Liz. Some parents stood in doorways to observe, and some parents sat in cars in the parking lot, looking inside through the windows.

She never told an adult that defendant was touching her, because she was uncomfortable and embarrassed to talk about it and did not want to leave the gym. S.H. testified that she was not afraid of defendant. She went on three trips to Lake Owen, Wisconsin, with defendant and Liz.

At B.P.'s November 23, 2002, sleepover, S.H. and some girlfriends discussed defendant's touches. Most of S.H.'s teammates were present. S.H. was a close friend of N.E. and B.P. S.H. further testified that, the night before the sleepover, she told her mother about defendant's inappropriate touching. She testified that she was uncomfortable talking to her mother about all of the details and circumstances of defendant's touching. S.H. agreed, on cross-examination, that in neither an interview conducted on December 3, 2002, by investigators nor her 2002 discussion with her mother did she mention the Icy Hot or press handstand incidents. Nor did she mention the press handstand incident in her summer 2003 interview with prosecutors. Also, she did not mention in any of these three conversations the presence of N.E. or S.O. during two of the incidents.

The jury found defendant not guilty of penetrating S.H.'s sex organ with his finger. However, it did find him guilty of touching S.H.'s sex organ for the purpose of sexual gratification.

### 5. Complainant N.E.

Defendant was charged with predatory criminal sexual assault against N.E. for penetrating her sex organ with his finger and aggravated criminal sexual abuse for touching N.E.'s sex organ for

the purpose of sexual gratification. According to the charges, the two counts represented alternative theories relating to the same act, which occurred sometime between July and October 2002, while N.E. stretched against mats by a vault and the uneven bars.

At trial, N.E. testified that she started classes at the gym when she was 6 years old (1996) and left the gym when she was 12 years old (November 2002). As to the charged conduct, N.E. testified that, in August 2002, she had a private lesson with defendant on a weekend morning. No one else was present at the gym. She was performing a straddle stretch, lying on her back with her legs spread against a mat. Defendant sat on her chest, facing the mat. He touched her knees with his hands and pushed down on them to help her stretch. Defendant slid his hands down N.E.'s legs, touching her inner thighs. He moved his hands underneath her bottom and pushed it closer to the mat, which made her leotard looser in her crotch area. Defendant put his hands back on N.E.'s inner thighs and then down to her vagina. N.E. testified that defendant touched her vagina with his right fingers and moved them up and down. His fingers touched the skin surrounding the opening of her vagina, and he touched the opening of her vagina for 10 to 15 seconds. N.E. could feel defendant's fingernail inside the opening of her vagina for three to five seconds. She moved her body, and he stopped touching her. N.E. testified that, when defendant told her to stretch by the mat during her private lesson, she knew what he was going to do to her. She did not tell defendant that she did not want to go by the mat or that she did not want to perform the stretch. N.E. did not say anything to defendant.

Next, N.E. testified to two categories of uncharged conduct. First, she testified that defendant touched her vagina during a stomach straddle stretch. He pushed down on her tailbone, pulled her bottom back, making her leotard looser, and put his hand under her leotard to touch the skin

surrounding the opening of her vagina. He put his finger inside the opening. He did not put his finger in very far; he moved his fingers up and down on the skin surrounding the opening.

Second, N.E. testified that defendant touched her during a wheel exercise by moving his hand from her stomach to between her legs and then to her vagina. His fingers touched the skin around the opening and moved up and down on her skin. Defendant's finger did not go inside N.E.'s vagina.

In an interview on November 26, 2002, N.E. said that the touching happened "like maybe 10" times. At that time, she stated that defendant touched her on, not in, her "crotch" during the straddle stretch. N.E. did not mention being touched during the wheel exercise. When the investigators asked her whether defendant ever touched her anywhere else on her body, N.E. answered "No. ***
Well, not inappropriately, no."

During an interview in October 2003, N.E. told an assistant State's Attorney that defendant inappropriately touched her approximately once per week, but not every week. At trial, N.E. estimated that during straddle stretches defendant touched her vagina about one time per month. The touching continued either once a week or once a month from December 2000 to August 2002. She estimated that defendant touched her during the wheel exercise "only a couple, like three" times.

N.E. testified that she saw defendant inappropriately touch B.P. She explained that she saw defendant assisting B.P. with an arch stretch--pulling her leg behind her, by her head--and that defendant put his hand by B.P.'s breast. She could not discern whether defendant touched B.P.'s breast. She did not see defendant touch B.P. on the vaginal area.

N.E. recalled that S.H. had a hamstring problem and that defendant would massage S.H.'s hamstring by a vault while S.H. lay on her stomach. N.E. did not see defendant do anything unusual or inappropriate when he massaged S.H.

N.E. testified that she observed defendant inappropriately touching S.O. She recalled S.O. performing a straddle stretch when defendant tried to touch S.O. by her crotch. N.E. could not recall what type of stretch S.O. was doing, where she was located in the gym, or what year this occurred. She could not see whether defendant touched S.O. inside or outside S.O.'s leotard. N.E. told S.O. to "come over by me" so that S.O. could get away from defendant.

N.E. testified that she generally did not focus on what defendant was doing to her teammates. She would look at him from time to time when defendant was with a teammate, but she did not see any other instances of inappropriate touching. She could not see every part of the girls' bodies while defendant spotted them. N.E. agreed that gymnastics is a relatively competitive sport and that, while waiting to use a piece of equipment, e.g., the uneven bars, she would look around the entire bar area to observe what the other girls were doing on their wheel exercises, as well as what was happening on the floor and the vaults. The girls watched each other as they practiced.

N.E. never told an adult that defendant touched her, because she liked defendant as a coach, she liked the gym, and she did not want to leave. She also liked defendant as a person. She was around 10 years old when the events occurred, and she trusted defendant. N.E. did not tell her mother about the touching until after B.P.'s November 2002 sleepover party. She was a close friend of the other complainants. They were like sisters and were friends for several years, they went to sleepovers and on trips together, and their parents associated with each other. N.E. testified that she

had discussed defendant's conduct with her friends, before the November 2002 sleepover and then again at the sleepover.

The jury found defendant not guilty of penetrating N.E.'s sex organ with his finger. However, it did find him guilty of touching N.E.'s sex organ for the purpose of sexual gratification.

### 6. Complainant S.O.

Defendant was charged with predatory criminal sexual assault against S.O. for penetrating her sex organ with his finger and with aggravated criminal sexual abuse for touching S.O.'s sex organ for the purpose of sexual gratification. According to the charges, these two counts represented alternative theories relating to the same act, which occurred sometime in the fall of 2001, while S.O. performed a stretch against a mat by a vault. In addition, defendant was charged with predatory criminal sexual assault against S.O. for penetrating her sex organ with his tongue sometime between November 2000 and November 2002, while S.O. stretched her hamstring.

At trial, S.O. testified that she began going to the gym when she was six years old. She left in November 2002. As to the charged conduct, S.O. testified that, in the fall of 2001, when she was 11 or 12 years old, she was performing a back straddle stretch against a mat, near a vault and the storage area. She lay on her back and defendant straddled her, facing the mat, and pushed down on her knees to help the stretch. S.O. stated that defendant moved his left hand to pull her leotard over, exposing her vaginal area. He then took his right hand and touched her vaginal area, specifically, "inside the two flaps over the raised bump," with one finger. He moved his finger back and forth. His finger touched the inside flaps of her vagina for 12 to 15 seconds, but his finger did not go inside the opening of her vagina. She agreed that, on any day in the fall of 2001, there might have been 100

to 200 people present in the gym. There were people on the floor and on the balance beam during this incident.

Describing another charged incident, S.O. testified that, approximately two years before she left the gym, she injured her left hamstring. She stretched her hamstring by lying on her back with her right leg on the ground and her left leg in the air. S.O. was stretching by the vault and foam pit area, with her feet towards the pit, a big blue mat on her left side, and a wall on her right side. Defendant kneeled on her right side with his right hand on her right leg and his left hand on her left leg to assist her with the stretch. He moved her leotard with his left hand and touched her vagina with his right hand. He then touched her vagina with his tongue "on top of the two flaps." His tongue did not go inside her vagina. There were people on the uneven bars. However, the mat between her and the bars was four or five feet higher than her body, which was lying on the ground. No one was on the vault. She could not recall whether people were on the floor.

S.O. then testified to two categories of uncharged conduct. First, S.O. testified that, during the approximately two seasons prior to her departure from the gym, defendant touched her vagina "about 20 times" during back straddle stretches. S.O. testified that, at some point, she told defendant to stop because it was "bad touching" and inappropriate. She could not recall the words she used and remembered speaking very quietly, in a whisper. S.O. did not know if defendant heard her. After she spoke up, defendant touched her again, but not as much as before. However, in a November 2002 interview, S.O. told investigators that defendant stopped touching her after she told him to stop.

Second, S.O. testified that the gym held a sleepover and that the girls put panel mats over beams and slept under the beams, like in forts. She testified that she was lying next to defendant. Liz was the closest person to defendant on the other side. S.O. conceded that her memory about the

incident was not "crystal clear." She testified that she was trying to go to sleep, and defendant touched her vaginal area with his finger through her pajama shorts. He then picked her up and rubbed the front of her body against his body.

During a November 2002 interview with investigators, S.O. did not mention that defendant used his tongue to touch her vagina during a hamstring stretch. S.O. testified that she did not tell investigators about the tongue incident because she was embarrassed and nervous. After the November 2002 interview, S.O. met with a counselor. After several meetings , S.O. admitted to the counselor that she had not told the investigators that defendant touched her with his tongue. S.O. told assistant State's Attorneys in October 2003 that defendant used his tongue during a hamstring stretch.

In a December 2004 interview, S.O. told investigators, for the first time, that defendant inappropriately touched her at a sleepover. In that interview, S.O. did not tell investigators that defendant touched her vagina during the sleepover, but she told them about the tongue incident. She also mentioned, for the first time, that defendant took her into a private area at the gym, the castle room, to ice part of her body and that he inappropriately touched her. At trial, S.O. could not recall why she was in the castle room or what defendant said or why he was there. She stated, "I just remember being in there. It was just me and [defendant]. And I remember he did something inappropriate."

On January 8, 2005, for the first time and three weeks before trial, S.O. told assistant State's Attorneys that defendant touched her during wheel exercises. At trial, S.O. admitted that she never mentioned touching during wheel exercises in her first videotaped interview in 2002, to her counselor, during her second videotaped interview in 2004, or to her parents. She testified that she

did, however, have conversations with other girls after their interviews, specifically A.S., where they said that they had been touched during wheel exercises. S.O. testified that her conversation with A.S. made her remember that it had also happened to her.

On cross-examination, when asked how many times she had been inappropriately touched by defendant prior to the fall 2001 charged incident, S.O. stated that she had not counted, but could estimate "maybe four times." She stated that the incidents were a "blur."

S.O. further testified that, approximately two years before she left the gym, she and S.H. were performing press handstands on the vault runway across from the floor. According to S.O., S.H. told her that defendant put his fingers down S.H.'s leotard. S.O. testified that she approached defendant and whispered in his ear, "[S.H.] said that your fingers went down her leo." Defendant responded that he could have been looking around the gym and that it could have accidently slipped in. S.O. did not tell the investigators about her conversation with S.H. during the press handstands or her conversation with defendant regarding his touching S.H. during that exercise. She testified that she did not realize that his claiming it was an accident was important.

According to S.O., in the summer of 2002, at home, she told her mother that defendant inappropriately touched her. She told her mother that it had not happened before, that it happened only once, that defendant was spotting her when it occurred, and that she thought that it was an accident and "no big deal." S.O. testified that, although she told her mother it happened only once, that was not the truth. She did not tell her mother that defendant had touched her vagina. She said that he touched her "private."

S.O. was present at B.P.'s sleepover on November 23, 2002. She participated in a conversation with other girls at that sleepover about defendant inappropriately touching girls. Prior

to the sleepover, S.O. had discussed defendant's touching with N.E. and B.P. S.O. and her teammates attended defendant's wedding. S.O. was a close friend of her teammates.

The jury found defendant not guilty of penetrating S.O.'s sex organ with his finger, but guilty of touching S.O.'s sex organ for the purpose of sexual gratification. It found defendant not guilty of penetrating S.O. with his tongue.

### 7. Complainant C.E.

Defendant was charged with two counts of predatory criminal sexual assault against C.E. for penetrating her sex organ with his tongue and finger. He was charged with aggravated criminal sexual abuse for touching C.E.'s sex organ for the purpose of sexual gratification. All three acts allegedly occurred between November 6 and 8, 2002, in a preschool room.

C.E. was the first child to publicly accuse defendant of inappropriate touching. At trial, C.E. testified that she began taking classes at the gym when she was four years old. She left the gym when she was seven years old.

As to the charged conduct, C.E. testified that, in November 2002, she scraped her knee in the gym and defendant took her into a smaller room off of the main gym to get a Band-Aid. The room was a small kitchen with a microwave, a refrigerator, and counters. Defendant took a Band-Aid from a closet and then took C.E. into the house room (a preschool room that has a toy house inside). No one else was in the house room. C.E. was wearing a leotard. They went into the house, and C.E. sat down on the carpet. Defendant was in front of her. Defendant pulled the bottom of her leotard over and used his finger to touch her privates. She could not recall if he used more than one finger. She felt defendant put his finger in the opening of her vagina. C.E. testified that, after defendant removed his finger, he used his mouth and put his tongue inside her vagina. C.E. testified that

defendant tried to pull down the top of her leotard, but she pulled it back up. Defendant then touched her vaginal area with his fingers some more. After defendant stopped, he handed her the Band-Aid and she returned to the gym. As they were walking out of the house room, defendant told her not to tell anyone about the incident.

C.E. testified to between 56 and 67 incidents of uncharged conduct. First, C.E. testified that defendant had previously touched her the same way as during the "Band-Aid incident." He had touched C.E. primarily inside her vagina with his finger and tongue in some of the smaller rooms off of the main gym, including the music room, the house room, and the castle room, and with his finger: (1) in the main gym, behind mats; (2) when she was doing splits by a vault; and (3) in the foam pit. C.E. testified that defendant shut and sometimes locked the doors to the smaller rooms when he took her in them and touched her. She recalled being touched once in the music room between January and June 2002 but could not recall if it happened in the music room more than once. At that time, other gymnasts were chasing defendant to squirt him with a water bottle. He grabbed C.E. and ran into the music room with her and touched her by a piano. The other girls, including Crystal Soloff, were banging on the door for a full 10 minutes while defendant touched C.E. She could not recall if it was with his hands or his mouth, but "it was probably [with both] because normally it's both."

On cross-examination, C.E. testified that, whenever defendant took her to other rooms over the three-year-period, she would be in the middle of her gymnastics class. At the time of the Band-Aid incident, C.E. had several coaches, including Diane O'Brien, Justin Hawk, Sandy Huston, and Liz. Accordingly, defendant would approach whoever was coaching her at the time and say, "I need [C.E.] for a second." Specifically, C.E. recalled defendant telling O'Brien that he needed to take C.E.

for a second. She testified that, when defendant took her into other rooms, she would be gone for approximately 10 minutes. These incidents occurred while the rest of her group was doing gymnastics. She knew what he was going to do, but did not say anything because she was not sure what to say and was scared. C.E. did not complain to anyone. She was asked, "That went on for three years, and during that time he took you out as many as 50, 60 times, could that be right?" She replied, "Could be, I'm not sure." Later, she agreed that it happened around 50 or 60 times.

Regarding other uncharged conduct, C.E. testified that defendant showed her his penis on one occasion and tried to touch his penis to her mouth by taking her head with his hands and pushing it down. She could not recall where she was when she saw his penis, or when the event occurred.

C.E. testified to uncharged conduct that allegedly occurred at a gym sleepover. Close to 100 girls were present at the sleepover. They were sleeping all over the gym, in forts they made with mats. C.E. testified that, at the sleepover, defendant touched her in the vagina, in the gym behind a mat. In addition, C.E. testified that defendant came into her fort and touched her privates. Apparently, this touching was previously undisclosed and came out for the first time at trial. C.E. testified that she was in the fort with her friend, Crystal Soloff. Defendant came into the fort, got into C.E.'s sleeping bag with her, and touched her vagina under her pajamas. She testified that neither she nor Soloff was asleep when this occurred. They continued talking, telling stories, and laughing. C.E. testified that Soloff was looking at her and laughing and that defendant was laughing while he reached into her sleeping bag, pulled her pajamas aside, and put his hands on her vagina. After this occurred, they went out of the fort and played in the gym.

C.E. also testified to three incidents of uncharged conduct involving the foam pit. The first touching in the pit allegedly occurred at the sleepover, after defendant touched C.E. in the fort. Specifically, C.E. left the fort and went into the pit with her friends and defendant. There, defendant made her hold his penis. Approximately five or six girls were in the pit while defendant touched her and made her hold his penis. The lights were on and about 100 other girls continued to play in the other areas of the gym. Other coaches were also present.

In addition, C.E. testified that defendant behaved inappropriately in the pit on two other occasions. She testified that, on one occasion, defendant again made her touch his penis with her hand. She was buried up to her shoulders in the pit; defendant was next to her in the pit and was also somewhat buried. He took his penis out of his shorts, grabbed her hand, and put her hand on his penis. On a second occasion, also while buried in the foam pit, defendant touched his penis to her vagina. C.E. explained that defendant opened up the bottom of her leotard, took his penis out of his pants, and put his penis on her. Numerous other people were present in the gym during these acts. C.E. testified that once or twice when defendant touched her, she would say, "I don't like that," but she did not say it every time.

Finally, with respect to uncharged conduct, C.E. testified that, on the same day as the Band-Aid incident, defendant touched her while stretching her behind a mat. Crystal Soloff was stretching next to her.

About a week after the Band-Aid incident, C.E. had a sleepover at her house with some of her friends. She talked to her friends about defendant touching her, but she did not tell her friends everything. That night, C.E. told her mother that defendant assaulted her, but she did not provide details or tell her everything. C.E. said only that defendant touched her privates with his finger and

tongue. C.E. told her mother that it happened all the time, too many times to count. After the sleepover, she did not return to the gym again.

A few days after telling her mother, C.E. was twice interviewed by personnel at the Du Page County Children's Center. She tried to tell them everything that she could remember. C.E. told them that it happened "a lot." Of all the people she spoke to about the incidents, she felt most comfortable talking with Dee Fisher, a counselor. At the time of trial, C.E. had met with Fisher every week for two years. She told Fisher that "it happened all the time."

The jury found defendant not guilty of penetrating C.E.'s sex organ with his finger or his tongue. However, it found him guilty of touching C.E.'s sex organ for the purpose of sexual gratification.

### 8. Additional Complainants

Seven other complainants accused defendant of inappropriate touchings similar to those described above. Specifically, defendant was charged with: (1) touching B.H. on her sex organ sometime between February 1999 and 2001, in the foam pit; (2) touching R.H.'s sex organ in 1999 or 2000 in the foam pit; (3) touching A.V.'s sex organ sometime in the summer of 2000, during wheel exercises, and sometime between January 2, 2002, and June 2002, during straddle stretches near a vault or during wheel exercises; (4) touching T.W.'s sex organ in September 2002, during a stretch exercise near a vault, and on her breast on a Wednesday in 2002, during wheel exercises; (5) touching K.G. on her sex organ in the summer of 2001, during stretch exercises on the spring floor; (6) touching A.W.'s sex organ sometime between September 2001 and June 2002, during straddle stretches near a mat; and (7) touching A.C.'s sex organ sometime between September 1 and 30, 2002,

during a "planche" exercise. These complainants testified at trial about the charges as well as uncharged conduct. The jury found defendant not guilty of the charges.

### 9. A.T.S.

After the State concluded its presentation of the complainants of charged conduct, the jury was instructed that evidence would be presented that defendant was involved in another uncharged offense. It was instructed that such evidence would be received on the issues of defendant's intent, absence of innocent mental state, and any matter to which it was relevant. "It is for you to determine whether the defendant was involved in this offense[] and [,] if so, what weight should be given to this evidence."

A.T.S. testified that, at the time of trial, she was 10 years old. When she was five or six years old, in approximately July 1999, she took her first gymnastics class at Rush-Copley Healthplex. Defendant was her coach. She liked him and thought he was funny. On direct examination, A.T.S. stated that, on her last day of class, after stretching, defendant grabbed her "private" over her clothes while assisting her with a cartwheel. He cupped her "private" in the middle of the cartwheel, and, when she was finished with the cartwheel, he said, "good job." It felt like his hand cupped her private area. This occurred one time. Six or seven other classmates were present. After class, A.T.S. told her mother about the incident.

A.T.S. was not asked about this incident again until three years later, in a December 26, 2002, interview. There, she said that she felt like she had been pinched. She also stated that she did not like defendant's hand on her hip while he helped her with the cartwheel. She agreed that her memory at trial of the incident was different from her memory during the 2002 interview.

Mary Marx testified that she worked at the Rush-Copley Healthplex as an activities director. She identified defendant as a tumbling coach at that facility from September 1998 to September 1999. Marx received a call in July 1999 from A.T.S.'s mother. As a result, Marx had a meeting with defendant and informed him that A.T.S.'s mother had complained that defendant touched A.T.S. between her legs. In response, defendant was shocked and "very concerned, very upset, and just very, very concerned. *** He said that he never intentionally would touch someone in their private area, that during a stretch or an exercise that it could have been misinterpreted, his hand could of [sic] slipped." Defendant's demeanor during the conversation was "upset, very emotional. He was even a little teary eyed over it."

Marx also met with her manager, A.T.S.'s mother, and defendant. Defendant again explained that he would never intentionally do anything to upset or hurt a child, and he was very upset and concerned. He demonstrated methods for spotting the gymnasts during class and stated that, if his hand brushed A.T.S. or slipped, it might have been misinterpreted. As a result of her conversations with defendant and A.T.S.'s mother, Marx did not contact law enforcement. She was contacted by law enforcement two years later.

The State rested its case. Defendant's motion for a directed verdict was denied. The trial court noted that defendant's primary argument in his motion for a directed verdict was that the witnesses were so lacking in credibility that the charges must be dismissed. The court disagreed, but noted that there was "certainly impeachment of various witnesses."

B. Defendant's Case

1. Witnesses

About100 witnesses testified on defendant's behalf. Some of their testimony is summarized as follows.

Defendant's first witness, Andrea Arndt, was the gym's office manager. Arndt testified about the gym's activity level and layout. She explained that parents often observed their children from inside the gym, from the hallways leading to the gym, and from the parking lot, looking inside through a wall of windows. The music room had windows, a wall with an opening that children could climb through, and two doors: one leading to the gym and the other to the hallway. The house room had four windows and three doors. The castle room had a window. Both the gym and the hallway were busy areas. From 2001 to 2002, about 100 to 150 students, instructors, and others were present in the gym at any one time. The hallway contained cubbyholes for storage of the children's personal belongings, and parents would congregate in the hallways before, during, and after practice. Video cameras were installed in 2003.

Arndt testified that she never saw defendant leave his coaching rotation. Arndt never saw any coaches send students to defendant. She never saw defendant stretch any girl behind a mat on the vault runway, nor did she see a mat placed vertically against a vault. She never saw defendant inappropriately touch a student.

Several witnesses testified that the gym was wide open, that one could view all of the children and activities in the gym from different areas, and that parents and others often watched the classes from the gym's doors and windows. Those witnesses included: parents Mary Ann Drafke, Tonya Glock, Laura Clark, Sharon Soloff, Marilyn Heisler, Grace Carpenter, Russell Seed, and Judi Hefner; coaches Michelle Drozd and Whitney Baldwin; and gym owner (and defendant's mother) Lynda Lynch.

Several witnesses, in addition to Arndt, testified to the high number of people present in the gym each day and to the high traffic areas in the gym, including the areas near the "resi mats" and the hallway leading to the gym from the preschool rooms. Those witnesses included: coaches Diane Douville, Diane O'Brien, Michael Jenkins, Russell Millard, and Jennifer Rolland; parents Lidia Stefani and Elaine Edgeworth; gymnastics-coaching experts Thomas Jones and Paula Ann Noe; and gymnasts Marissa Woosner and Colleen Finegan.

Various witnesses testified that defendant was extremely vocal and coached highly skilled students. Their execution of advanced, extremely dangerous tricks required him to closely supervise and spot the gymnasts by placing his hands on their chests, backs, upper legs, abdomens, and buttocks. Because defendant's students were talented and he had a loud voice while leading his team, he and his team were high profile within the gym. Many people, including instructors Justin Hawk, Diane Douville, Dawn Doychak, and Michelle Drozd, parents Mary Ann Drafke, Laura Clark, Deborah Zach, Kathy Horner, Marilyn Heisler, and Maria Wossner, and gymnasts Rachel Heisler and Rachel Seed, often watched defendant and his students.

In addition, witnesses testified that they observed defendant's behavior over the relevant time period and that they never witnessed defendant inappropriately touch anyone. Those witnesses included: cheerleading program director Dawn Doychak; coaches Diane Douville, Michael Jenkins, Ryan Kamykowski, Justin Hawk, Sandra Campbell, and Whitney Baldwin; parents Sheila Gatto, Mary Ann Drafke, Laura Clark, Marilyn Heisler, Russell Seed, Grace Carpenter, and Jeffrey Barnum; and gymnasts Ellen Daneluzzi, Ciana Carpenter, Bridget Conley, and Colleen Finegan.

Coaches Diane O'Brien, Justin Hawk, and Rachel Strang agreed that it was a strict gym policy that gymnasts stayed within their groups. Each gymnast was required to be paired up with

another team member. Coaches did not send girls from their groups to defendant. Witnesses testified that they never saw defendant isolate a student in a private area of the gym. Those witnesses included: teachers Carolyn Rotunda, Sandra Campbell, and Sheila Gatto; parent Grace Carpenter; coaches Michael Jenkins, Justin Hawk, Traci Scardina, Kathleen Baldwin, and Russell Millard; and students Cheryl Huston, Shannon O'Brien, Christine Campanelli, Ellen Daneluzzi, and Bridget Conley. In addition, witnesses who testified that they never saw defendant remove any girl from the main gym included: Dawn Doychak, Sheila Gatto, Sandra Campell, Dawn Drozd, Brittany Gatto, Marilyn Heisler, Arianna Zack, and Casey and Shannon Feicco.

In 2000, defendant coached an upper-level group of students. Although C.E. took classes at the same time defendant's team practiced, defendant was not her coach. According to Arndt, on November 8, 2002, the date that defendant allegedly touched in the house room while applying a Band-Aid, several team parents were utilizing the castle room to prepare for the annual home gymnastics competition. Dawn Doychak testified that she spent a substantial period of time in the preschool rooms on November 6 and 8, 2002, and that she never saw defendant in those rooms on those dates. Witnesses who testified that they never saw defendant remove C.E. from the gym or her group included: teachers and coaches Rachel Strang, Sandra Campbell, Traci Scardina, Justin Hawk, Russell Millard, and Cheryl Huston; and gymnasts Kylie Clark and Marissa Wossner.

Coach Michael Jenkins testified that, on November 8, 2002, the day of C.E.'s alleged Band-Aid incident, he saw and heard C.E. and another girl ask for a Band-Aid. He watched the girls accompany defendant into the front office to look for Band-Aids. Both girls returned to the gym two to three minutes later, followed by defendant almost immediately thereafter.

Russell Millard, who was to coach C.E. on November 8, 2002, testified that, prior to coaching her at 5:30 p.m., he took several items into the preschool rooms in preparation for the upcoming weekend competition. He testified that there were people in the castle room at all times and that he saw Diane Grosso in the house room. Millard returned to the main gym, where he saw C.E. and Crystal Soloff. Defendant was near the bars, nowhere near C.E.

Crystal Soloff testified that she was C.E.'s friend. She recalled that, on November 8, 2002, prior to practice, C.E. fell and injured herself on her hip while playing on the bars with Soloff. C.E. informed defendant of the injury, and defendant told her to wash the wound in the bathroom. Soloff went with C.E. to the bathroom, and C.E. washed her wound. Meanwhile, defendant searched for a Band-Aid in the gym, by the office, but was unable to find one. C.E. and Soloff followed defendant to the kitchen between the castle and house rooms. Soloff leaned against the door and watched defendant take a Band-Aid from the cabinet and place it on C.E.'s hip. Soloff was approximately one foot away from defendant and C.E. Defendant did not touch C.E. near her private area. While standing in the kitchen, Soloff heard people talking in both the house and castle rooms. Immediately after the Band-Aid was applied, Soloff and C.E. ran back to the gym and began practicing. Soloff did not recall C.E. going near a mat to do straddle stretches later that day, and she testified that she did not do straddle stretches by a mat that day. Soloff did not recall any coach ever taking C.E. away from the group in the gym to another location in the building. She did not recall defendant grabbing C.E. and bringing her into the music room, being locked out of the music room, or banging on the door to be let in.

Soloff was present at the sleepover where defendant allegedly touched C.E. She recalled defendant peeking into their fort to tell them to go to sleep. Defendant was present for "like maybe

five seconds at the most." Afterwards, the lights were turned off, and C.E. and Soloff fell asleep. Soloff did not witness any inappropriate conduct. She never saw defendant in the foam pit with C.E.

In her years at the gym, Soloff never saw defendant touch any girl in a private area of her body. Defendant was never her coach, but she watched him "a lot" because he was one of the best coaches at the gym.

Diane O'Brien testified that, from the summer of 2002 through November 2002, she coached C.E. Defendant never coached C.E. In addition to the gym's strict rule that gymnasts must stay with their own coaches, O'Brien had "Diane's Rule," a rule that her students could not ever leave her group without her permission. When asked whether defendant ever took any girl out of her class, O'Brien responded "absolutely not." No coaches ever took girls out of her class. Defendant never took C.E. out of the gym. O'Brien never saw defendant leave his groups of gymnasts, take girls out of his groups, or take girls out of the gym.

In the State's case-in-chief, a student named A.W. had testified that she saw defendant take C.E. out of O'Brien's group on three occasions, that she once asked O'Brien where defendant went with C.E., and that O'Brien said that she did not know. In response, O'Brien testified that A.W. never came to her and asked about defendant taking C.E. out of class. She reiterated that C.E. was never taken from her class.

In late October 2002, coach Justin Hawk witnessed defendant applying Icy Hot to S.O.'s hamstring. Hawk stood two to three feet away from defendant and had a conversation with defendant while defendant applied the Icy Hot. Hawk could see defendant's hands at all times. Defendant's hand never went underneath S.O.'s leotard; his hand was about five inches away from her leotard, closer to S.O.'s knee. Hawk recalled that Liz was standing on the floor and that another

coach, Michelle Drozd, was nearby getting a springboard. Hawk testified that the episode lasted about 1½ to 2 minutes. After 10 to 20 seconds, S.O. returned to her group.

Michelle Drozd recalled seeing defendant applying Icy Hot to an injured gymnast's hamstring while Justin Hawk, Liz, and others looked on. Drozd could not discern who the gymnast was--she was lying on top of a mat--but testified that defendant's fingers never came near the gymnast's crotch. The gymnast got up and rejoined her group.

Liz Cardamone testified that she witnessed A.S. push defendant into the pit on one occasion. Defendant grabbed A.S. to brace himself, and they both fell into the pit. In an effort to get out of the pit, defendant pushed against A.S., and A.S. bit him. Liz testified that she was standing at the edge of the pit and could see defendant's entire body, including his hands. The incident lasted about 20 seconds, and there was no inappropriate contact.

Gymnast Brittany Gatto testified that she attended B.P.'s sleepover on November 23, 2002. S.O., S.H., A.S., and N.E. were also present. B.P. told the group that C.E. had alleged that defendant had inappropriately touched her. According to Gatto, many complainants, including N.E., S.O., A.S., and B.P., stated that C.E.'s allegations were untrue. Gymnast Colleen Finegan was also present at B.P.'s sleepover. She testified that the attendees discussed C.E. and defendant for less than 20 minutes. Afterwards, "everyone went back to normal."

2. Defendant's Testimony

Defendant took the stand in his own defense. He denied all the allegations of charged and uncharged conduct.

In addition, defendant testified that, around 1996 or 1997, he began training complainants N.E., S.H., S.O., B.P., and A.S. About six years later, in the spring of 2002, defendant received a

scrapbook from the girls, thanking him and praising him as a coach. A few months later, defendant split the girls into different training groups due to different skill levels. Some of the girls, including S.O., B.P., and A.S., became uncooperative. S.H. had left the gym in the spring of 2002, and A.S. and another complainant, A.C., quit the gym in the fall of 2002.

Defendant testified that, on one occasion, A.S. pushed him into the pit, they both fell in, and she bit him on the way out. He never inappropriately touched her. Defendant applied Icy Hot to S.O.'s leg on the vault runway, at her request. He denied touching her inappropriately, and he denied ever speaking to S.O. about his alleged touching of S.H.

Defendant denied doing wheel exercises with the girls, taking girls from their groups to stretch them, or taking girls behind the mats near the vault area. Specifically, he testified that his gymnasts were highly skilled and did not need his assistance with the wheel exercise, which was a strengthening exercise. He explained that to assist them in performing the exercise would have defeated the purpose of the drill. Defendant testified that he would occasionally align a student during wheel exercises by adjusting her shoulders or tapping her stomach. Defendant testified that, while coaching a student on an event, he did not leave his group to stretch another girl. Typically, flexibility was conducted at the end of practice and was run by Liz; defendant would assist with flexibility only if Liz requested his help.

Defendant never coached C.E. He did assist her with a skill on one occasion, with her father watching. After his assistance, C.E.'s mother requested that defendant provide C.E. with private lessons, which he declined because he was not her coach. Approximately one week later, C.E. cut her hip. Defendant told her to wash the cut in the bathroom. C.E. and Soloff returned from the bathroom and told defendant that C.E. was still bleeding. Defendant went to the kitchen to retrieve

a Band-Aid; C.E. and Soloff followed him to the kitchen. Defendant placed the Band-Aid on C.E.'s hip while Soloff watched from the doorway. The hallway outside the kitchen door was busy with parents and preschool children. After the Band-Aid was applied, C.E. and Soloff returned to the gym.

Defendant recalled a sleepover at the gym prior to C.E.'s injury. Several girls and parents were present, and defendant slept next to coach Justin Hawk, in a hammock hung from the ceiling rafters. Defendant recalled going from fort to fort, instructing the girls to be quiet or to go to sleep, but testified that he never entered the forts. He denied ever touching or violating C.E. in November 2002 or on any other occasion.

As to A.T.S., the student from the Rush-Copley Healthplex, defendant denied ever touching her inappropriately. He agreed that he taught a few classes at Rush, but testified that he did not teach there or receive pay after April 1999.

## C. Verdict and Sentence

The jury deliberated for three days. Of the 26 counts charged, the jury found defendant guilty of 9 counts of aggravated criminal sexual abuse against 7 of the 14 girls. The trial court denied defendant's posttrial motions and sentenced him to 20 years' imprisonment. Defendant appeals.

## III. ANALYSIS

### A. Other-Crimes Evidence

Before trial, the State moved in limine to admit other-crimes evidence pursuant to section 115--7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115--7.3 (West 2002)). The trial court excluded some of the State's requested evidence, namely, incidents that allegedly occurred with persons other than the complainants or outside of a gymnastics setting (e.g., regarding

defendant's stepsister). The trial court granted the motion as to the uncharged conduct alleged by the complainants and A.T.S. Defendant argues that the trial court abused its discretion and contends that: (1) the State's notice of the other crimes was deficient under section 115--7.3(d) of the Code (725 ILCS 5/115--7.3(d) (West 2002)); (2) the evidence was improperly elicited by the State at trial, where it offered no specific information concerning the other crimes; and (3) the probative value was outweighed by the unfair prejudice, juror confusion, and delay. Although defendant presents these as his fourth and fifth arguments on appeal, we address them first.

A trial court's decision to admit other-crimes evidence will not be reversed unless the court abused its discretion. People v. Donoho, 204 Ill. 2d 159, 182 (2003). We will find that the trial court abused its discretion if the court's determination is unreasonable, arbitrary, or fanciful, or if no reasonable person would adopt the trial court's view. Donoho, 204 Ill. 2d at 182.

Section 115--7.3 of the Code provides that, when a defendant is accused of predatory criminal sexual assault of a child or aggravated criminal sexual abuse, evidence of the defendant's commission of another such offense "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115--7.3(a)(1), (b) (West 2002). Here, defendant was charged with predatory criminal sexual assault of a child and aggravated criminal sexual abuse; both are offenses to which section 115--7.3 applies. Further, as required by the statute, the evidence of uncharged conduct that was admitted involved additional acts of the same offenses.

Where the other-crimes evidence meets the preliminary statutory requirements, it is admissible if (1) it is relevant; and (2) its probative value is not outweighed by its prejudicial effect. Donoho, 204 Ill. 2d at 177-78. Admission of the evidence is not mandatory, even when the statutory

requirements are satisfied. Donoho, 204 Ill. 2d at 180-81. The admission of other-crimes evidence should be limited. See People v. Boyd, 366 Ill. App. 3d 84, 95 (2006) (other-crimes evidence must not become a focal point of the trial, and the detail and repetition admitted must be narrow so as to avoid the danger of a trial within a trial).

As to relevance, the trial court found that the uncharged conduct was relevant to the issues of defendant's intent, absence of an innocent mental state, and course of conduct to corroborate the victims' testimony concerning the charged offenses.

We agree that the evidence was relevant, although perhaps not for the reasons stated by the trial court. For example, the trial court determined that the evidence was relevant and probative to intent and innocent state of mind, noting that some gymnastics coaches might testify at trial regarding "how certain situations are handled." However, defendant argues that his intent and innocent state of mind were not at issue because he did not assert in defense, for example, that the incidents happened but were accidental or were misconstrued. Rather, he flatly denied that he ever touched any of the girls in the manners alleged. When state of mind is not at issue because a defendant claims that the alleged events did not occur, admission of other-crimes evidence for purposes of establishing intent is inappropriate. See, e.g., People v. Stanbridge, 348 Ill. App. 3d 351, 356 (2004) ("[p]roving the absence of a mistake is necessary where the defendant's physical actions are undisputed but his state of mind is at issue"); People v. Woltz, 228 Ill. App. 3d 670, 674 (1992) (admitting other-crimes evidence to show absence of mistake was erroneous where the defendant did not claim accident but, instead, completely denied placing his finger in the victim's vagina).

Although some cases have held that other-crimes evidence is relevant in a sexual assault or abuse case to demonstrate the defendant's lack of an innocent state of mind, they have noted that

other-crimes evidence is treated differently in cases involving children and where the evidence is presented in a bench trial. See, e.g., People v. Deenadayalu, 331 Ill. App. 3d 442, 448 (2002) (citing cases). Thus, where defendant was charged with acts against children, was tried before a jury, and argued that the events never occurred, intent was an inappropriate basis for admission of the other-crimes evidence.

As to course of conduct, the State cites People v. Johnson, 296 Ill. App. 3d 53, 63 (1998), for the "well-established principle that evidence of a defendant's prior sexual activity with the same child is admissible to prove a course of conduct and to corroborate the victim's testimony." We agree that a single girl's testimony as to a single act of misconduct could paint an inaccurate picture of a defendant's conduct as to that girl. Here, however, the jury heard 14 complainants discuss relatively similar acts of charged misconduct. Thus, testimony by the 14 girls regarding the charges alone could have sufficiently outlined defendant's course of conduct and corroborated each other's testimony, without the risk of undue prejudice.

In any event, the Donoho court, relying on the statute's legislative history, held that section 115--7.3 of the Code permits the admission of other-crimes evidence for the purpose of showing a defendant's propensity to commit a sexual offense. Donoho, 204 Ill. 2d at 176. Although the trial court here did not explicitly rely on that basis in ruling, the State, in its motion, sought to introduce other-crimes evidence, in part, to prove defendant's propensity to commit a sexual offense. Therefore, although we disagree with the trial court's articulated bases of relevance, we conclude that the evidence was relevant to defendant's propensity to commit the charged offenses.

Thus, the central issue is whether the trial court abused its discretion by finding that the probative nature of the evidence was not outweighed by its prejudicial effect. Section 115--7.3(c)

of the Code provides that, in weighing probative value against prejudicial effect, a court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115--7.3(c) (West 2002). The supreme court has stated that, in considering the admissibility of other-crimes evidence under the statute, "we urge trial judges to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." Donoho, 204 Ill. 2d at 186.

Here, the vast majority of the State's case consisted of other-crimes evidence. The witnesses testified not only to the 26 acts charged, but to hundreds of uncharged acts. If our calculations are correct, it appears that the seven complainants upon whose allegations defendant was convicted testified that defendant committed between 158 and 257 uncharged acts. The chart below summarizes those complainants' testimony regarding uncharged conduct:

| WITNESS | UNCHARGED CONDUCT | NUMBER OF TIMES |
|---------|-------------------|-----------------|
| A.P. | Penetrated while stretching near vault | 40 to 50 times (on direct) 100 times (on cross) |
| A.S. | Penetrated while stretching near vault | 2 to 10 times |
| | Penetrated during wheel exercises | 5 to 15 times |
| | Touched breast in pit | 5 to 10 times |
| | | In total, touched inappropriately 30 times, penetrated vagina 20 times |
| B.P. | Touched breast during arch stretch | 7 to 10 times |
| | Touched vagina | 10 times |

| S.H. | Touched in pit | 1 time (added two or three more times on cross) |
|---|---|---|
| | Penetrated while massaging hamstring | 2 times |
| | Touched vagina during stretch | 1 or 2 times |
| | Touched vagina during wheel exercises | 2 times |
| | Touched vagina during press handstands | 1 time |
| | | In total, touched vaginal area not more than 10 times. Of those, penetrated 3 times. |
| N.E. | Penetrated during straddle stretch | 1 time |
| | Touched during wheel exercises | 2 or 3 times |
| | | In total: In 2002, said happened maybe 10 times. |
| | | In 2003, said happened about once per week, but not every week. |
| | | At trial, said once a week or once a month from December 2000 to August 2002. |
| S.O. | Penetrated during stretch | 20 times |
| | Touched vaginal area and rubbed body during sleepover | 1 time |
| | Touched during wheel exercises | 1 time |
| | Touched in the castle room | 1 time |
| | | In total, estimated touched maybe 4 times prior to charged incident. |

| C.E. | Penetrated vagina with finger and tongue in rooms off of main gym | 50 to 60 times |
|---|---|---|
| | Tried to touch penis to mouth | 1 time |
| | Made her touch penis in pit | 1 or 2 times |
| | Touched penis to vagina in pit | 1 time |
| | Touched vagina behind mat in gym | 1 time |
| | Touched vagina during sleepover in tent | 1 time |
| | Touched vagina while stretching behind a mat (same day, but after, Band-Aid incident) | 1 time |
| | | **TOTAL: 158 to 257 incidents of uncharged conduct** |

The foregoing are conservative estimates, as we ignored the figures summarizing the complainants' testimony on direct or cross-examination. Moreover, and importantly, this chart does not include either the uncharged incidents testified to by the seven other complainants or any of the testimony from A.T.S., whose entire testimony consisted of uncharged conduct.

In weighing the probative value against the prejudicial effect, the trial court found that: (1) the alleged other crimes were proximate to the charged crimes because all allegedly occurred between 1999 and 2002; and (2) the acts were factually similar in that they involved sexual touches of young gymnastics students and, according to the State, would be further examples of the "exact same conduct" charged. The court acknowledged that "[c]ertainly there is prejudicial effect," but it noted that the evidence was probative and relevant and that an inaccurate picture of defendant's course of conduct might be portrayed if the complainants were to testify only to the charged incidents.

In assessing whether the trial court's determination was erroneous, we note that section 115--7.3(c)(3) of the Code states that, in weighing probative value against prejudice, the court may consider "other relevant facts and circumstances." 725 ILCS 5/115--7.3(c)(3) (West 2002). The trial court here explicitly considered the first two statutory factors in the probative/prejudice analysis--proximity and factual similarity--but did not explicitly address the "other relevant facts and circumstances" prong. We believe that there are several facts and circumstances that weighed against admission. For example, unlike a case where the trial court might admit other-crimes evidence as it pertains to 1 or even 2 victims, the court here found admissible numerous acts alleged by 15 victims. In the face of so many allegations of misconduct, there was a great risk that the jury could find that defendant must have done something, or that it could find defendant guilty beyond a reasonable doubt not of the charges but, instead, of uncharged acts. See Boyd, 366 Ill. App. 3d at 94 (" 'unfair prejudice' 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged' "), quoting Old Chief v. United States, 519 U.S. 172, 180, 136 L. Ed. 2d 574, 588, 117 S. Ct. 644, 650 (1997). Indeed, defendant argues that this is exactly what the jury did, given its rejection of a large part of the State's case (i.e., no convictions as to seven complainants and no predatory sexual assault convictions). Similarly, there is a strong possibility that the evidence could have led to juror confusion and that the jury could have used one complainant's credible testimony about uncharged conduct to bolster weak testimony by another complainant concerning the actual charges.

Other facts and circumstances that weighed against admission include defendant's ability to defend himself, the acts raised for the first time at trial, and the ability of the jury instruction to cure undue prejudice. First, as to defendant's ability to defend himself, admission of so many allegations

of uncharged conduct, many of which were vague as to dates, placed defendant in the impossible position of accounting for his whereabouts and behavior almost all day, every day, over a three-year period. Second, it appears that some of these uncharged acts, such as defendant's conduct in C.E.'s fort during the sleepover, were raised for the first time at trial. Finally, we question whether the court's limiting instruction prior to the testimony was sufficient to protect defendant against undue prejudice. "[F]aith in the jury to follow instructions and *** separate issues is 'the cornerstone of the jury system.' " People v. Johnson, 239 Ill. App. 3d 1064, 1075 (1992), quoting People v. Illgen, 145 Ill. 2d 353, 376 (1991). However, "[w]hen the unfair prejudice is excessive, a limiting instruction will not save admissibility of the evidence." Boyd, 366 Ill. App. 3d at 94.

Case law is somewhat instructive. Nevertheless, it remains unclear how much propensity evidence is allowed under section 115--7.3 of the Code, as none of the cases we have found involve the number of victims or the magnitude of other-crimes evidence that is present here.

People v. Funches, 59 Ill. App. 3d 71, 73-74 (1978), involved a car theft. This court, applying common-law other-crimes principles,[2] reversed and remanded for a new trial where we found that excessive other-crimes evidence had been admitted. Preliminarily, we stated, "we believe the circumstances presented here are classic examples of prosecutorial overkill." Funches, 59 Ill. App. 3d at 73. We noted the deferential standard of review, but concluded that the trial court:

[2]Under the common law, evidence of other crimes is not admissible to show propensity, but is admissible if relevant to other, specified exceptions, such as motive, modus operandi, etc. See Donoho, 204 Ill. 2d at 170. Nevertheless, even under common-law principles, other-crimes evidence that meets one of the exceptions is inadmissible if the prejudicial effect of the evidence substantially outweighs its probative value. Donoho, 204 Ill. 2d at 170.

"abused its discretion in admitting extensive evidence concerning the defendant's participation in <u>numerous</u> car thefts which, although relevant and material to establish the defendant's intent and <u>modus</u> <u>operandi</u>, was highly prejudicial against the defendant in the minds of the jury. [Citation.] We further find that '[w]hat occurred here was violative of the notion of a fair trial' and '[t]he prejudice to the defendant was grave and inexcusable,' because of the probable impact of this evidence on the jury. [Citation.] Therefore, it was reversible error for the trial court to allow the State to introduce the testimony of <u>seven</u> witnesses whose cars were stolen in Chicago, the testimony of <u>four</u> individuals who purchased cars in Rockford from the defendant--which cars subsequently turned out to be stolen, and the testimony of Lamont Jacobs concerning the defendant's important role in other Chicago-to-Rockford car thefts." (Emphasis in original.) <u>Funches</u>, 59 Ill. App. 3d at 73-74.

We also noted that some references to other, similar car thefts would be permissible on remand, but that each case differs on its own facts and that no specific number could become an "all-applicable generality." <u>Funches</u>, 59 Ill. App. 3d at 74. Nevertheless, evidence of at least seven other car thefts was more prejudicial than probative because the "cumulative effect of the other crimes [was] highly prejudicial." <u>Funches</u>, 59 Ill. App. 3d at 74.

In <u>Stanbridge</u>, the court reversed a jury verdict and remanded for a new trial after concluding that the trial court erred in admitting evidence of a prior conviction and two uncharged offenses under section 115--7.3 of the Code. <u>Stanbridge</u>, 348 Ill. App. 3d at 358. There, the court held that the trial court's two articulated bases for admission--<u>modus</u> <u>operandi</u> and absence of mistake--were inapplicable to the facts of the case and that the evidence was unduly prejudicial, particularly given that it was admitted as part of the State's case-in-chief instead of as a response to evidence presented

by the defendant. Stanbridge, 348 Ill. App. 3d at 355-56, 358. The court noted that, "[w]here the determination of a defendant's guilt or innocence depends on the credibility of the defendant and the accuser, error is particularly likely to be prejudicial." Stanbridge, 348 Ill. App. 3d at 358.

The introduction of evidence of other crimes was upheld in People v. Wilson, 214 Ill. 2d 127, 139 (2005). There, our supreme court affirmed the admission of other-crimes evidence from two witnesses who testified that the defendant's conduct toward them was similar to the conduct in the two charged sexual abuse offenses. The two charges were that the defendant knowingly touched two complainants' breasts for the purpose of sexual gratification. At trial, in addition to testifying to the charges, one complainant testified that the defendant had also touched her on 10 prior occasions and the other testified that he touched her on 15 prior occasions. It appears that the admissibility of this testimony was not challenged. Instead, the defendant objected to the testimony of the two other witnesses, arguing that it was prejudicial and irrelevant to his intent because he denied touching the complainants sexually. The court, applying common-law other-crimes principles, held that admitting the testimony as relevant to defendant's intent was appropriate because the defendant tried to place an innocent construction on his acts by describing himself as "touchy-feely," stating that it was not uncommon for him to touch someone's shoulder, waist, or back, with no sexual connotation, and asserting that his actions may have been "misinterpreted." Wilson, 214 Ill. 2d at 139. The court contrasted those facts with other cases where "no reasonable jury could have believed that the charged events happened accidentally or unintentionally," namely, where one defendant allegedly inserted his finger into the victim's vagina and another accosted a student in his office. Wilson, 214 Ill. 2d at 138, citing People v. Bobo, 278 Ill. App. 3d 130 (1996), and Woltz, 228 Ill. App. 3d 670.

The foregoing cases instruct that a large volume may make probative other-crimes evidence overly prejudicial. Certainly, the magnitude of other-crimes evidence was determinative in Funches, and the magnitude of evidence admitted here is even greater. The decision in Stanbridge is relevant because the court there found the other-crimes evidence to be overly prejudicial where it was presented in the State's case-in-chief, as it was here. In Wilson, where the other-crimes evidence was upheld as admissible, the key factor in the court's analysis was the defendant's attempt to put an innocent construction on his actions. Here, however, defendant argued that the alleged events never happened. Moreover, the magnitude of evidence admitted in Wilson, even including the complainants' testimony regarding uncharged touching, was far less than that admitted here.

We believe that the trial court abused its discretion here, as no reasonable person would find that the probative value of the other-crimes evidence was not outweighed by its prejudicial effect.[3] As the State conceded at oral argument, section 115--7.3 anticipates a point where probative value may be outweighed by prejudice. The trial court noted that the evidence was prejudicial, but then found that it was probative and admissible without conducting a "meaningful assessment of the probative value versus the prejudicial impact of the evidence." See Donoho, 204 Ill. 2d at 178. Clearly, some of the evidence was admissible and it is difficult to determine precisely where to draw the line. Nevertheless, we believe that the probative value of the evidence here--namely, to establish propensity or even course of conduct to corroborate testimony--could have easily been established by the 14 complainants' testifying to the charges and perhaps a few instances of uncharged conduct. Instead, the volume of the other-crimes evidence was overwhelming and undoubtedly more

---

[3]We note that the prejudicial effect also substantially outweighed the probative value, if such a standard were to apply.

prejudicial than probative. See <u>Stanbridge</u>, 348 Ill. App. 3d at 358 ("[w]here the determination of a defendant's guilt or innocence depends on the credibility of the defendant and the accuser, error is particularly likely to be prejudicial").

Because we agree that the evidence was more prejudicial than probative, we need not address defendant's alternative arguments that: (1) the State's pretrial notice of the uncharged conduct was deficient because the acts described in the notice were different from the acts testified to at trial; and (2) although section 115--7.3(e) requires that proof of the other crimes be made by "specific instances of conduct," the complainants testified to numerous acts of uncharged conduct with virtually no specificity regarding dates or circumstances. Nevertheless, we consider as contributing factors to the prejudicial nature of the evidence the vagueness of the evidence, the difference between the number of instances disclosed pretrial and the number testified to at trial, and the incidents that arose for the first time at trial.

### B. Unanimity Instruction

Defendant next argues that the trial court abused its discretion in rejecting his proposed unanimity instruction, which instructed the jury that it had to unanimously find defendant guilty beyond a reasonable doubt as to each charged act. As a result, he contends that there was a risk that he was subjected to nonunanimous verdicts. "The decision to give or refuse a non-Illinois Pattern Jury Instruction *** is within the sound discretion of the trial court." <u>People v. Edwards</u>, 337 Ill. App. 3d 912, 926 (2002).

Defendant's proposed unanimity instruction stated:

"Defendant is accused of having committed the crimes of predatory criminal sexual assault of a child, aggravated criminal sexual abuse and battery.

　　　　In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of <u>the specific act</u> constituting that crime <u>within the period alleged</u>. You must unanimously agree upon the commission of <u>the same specific act constituting the crime within the period alleged</u>." (Emphasis added.)

Defendant asserts that, where the majority of the State's case consisted of other-crimes evidence, an instruction that told the jury that it must unanimously find defendant's guilt as to each crime <u>charged</u> was warranted. He contends that the failure to so instruct the jury, in light of the voluminous other-crimes evidence, subjected him to the possibility of nonunanimous verdicts on the charges. See <u>People v. Causey</u>, 341 Ill. App. 3d 759, 770 (2003) (jury must be unanimous regarding a defendant's guilt or innocence of the crime charged). In light of our conclusion regarding the other-crimes issue, we agree.

　　　　The trial court found that <u>People v. Harper</u>, 251 Ill. App. 3d 801 (1993), mandated expulsion of defendant's proposed instruction. In <u>Harper</u>, the defendant was charged with sexually penetrating the victim by inserting his penis into her vagina. A statement made by the defendant that the victim had engaged in oral sex with him before she climbed on top of him and engaged in intercourse was admitted as other-crimes evidence. The defendant complained that the jury verdict might not have been unanimous because of the other-crimes evidence, that the charge against him specifically alleged vaginal intercourse, and that some of the jurors might have voted to convict based on vaginal intercourse while others might have voted based upon the evidence of oral sex. The appellate court rejected the defendant's argument that the State had to prove the specific form of penetration alleged in the information and that the jury had to unanimously find him guilty of that specific conduct. It held that the jury could have convicted the defendant of penetration based on either act. <u>Harper</u>, 251

Ill. App. 3d at 806. However, the court noted that the other crime was not remote in time or place from the charged act, but was part "of the same intertwined series of events." Harper, 251 Ill. App. 3d at 805. Thus, while the jury did not have to be unanimous regarding the theory of penetration or as to how the penetration occurred, it did have to unanimously conclude that the defendant committed an act of penetration during the charged act. Harper, 251 Ill. App. 3d at 807-08.

Here, the facts are distinguishable. To the extent that the State had alternative theories for what occurred during the charged acts, it formally charged defendant in separate counts. In contrast, the other crimes allegedly occurred not during the charged acts but, rather, on different days, and they constituted completely different acts from those charged.

At oral argument, the State agreed that the majority of its case consisted of other-crimes evidence. However, it argued that defendant's unanimity instruction, although not legally incorrect, was unnecessary because it was superfluous. We disagree. The jury received separate instructions for each complainant and for each crime pertaining to that complainant, and it received a unanimous verdict form for each charge. Nevertheless, while the instructions set forth the elements of the charges and the general instruction that the jury had to find the elements of each crime beyond a reasonable doubt, the instructions did not, for example, provide any dates of conduct or a description of the conduct charged such that it was clear that the jury had to unanimously find that all elements were proved regarding charged allegations. We do not hold that specificity regarding dates or a description of the conduct was required. But the fact remains that there was nothing to emphasize that the jury had to be unanimous regarding the charges only, and defendant's instruction would have provided an additional safeguard to that effect. In other words, where the majority of the State's case involved uncharged offenses that allegedly occurred in the same time frame as the charged offenses,

a separate instruction that the jury had to be unanimous regarding the underline charges was warranted. We do not agree that the trial court's limiting instruction regarding other crimes, given during trial and at the close of trial, adequately addressed the issue. The limiting instruction informed the jury that the other-crimes evidence could be considered as to defendant's intent, to corroborate the complainants' testimony, or for any other purpose deemed relevant. This instruction did not address the fact that the jury had to reach a unanimous decision on the charges. As a result, one or more jurors could have convicted defendant of other crimes introduced at trial.

Depending upon how much, if any, other-crimes evidence is admitted on remand, this issue might not arise again. Moreover, we do not hold that this type of instruction is warranted in all cases. Here, however, we find that, under the facts of this case, the refusal to provide the instruction was error in light of the volume of other-crimes evidence, the general nature of the jury instructions, and the failure of the other-crimes instruction to address the issue.

### C. Exclusion of Expert Testimony

Defendant next contends that the trial court abused its discretion in excluding testimony from his proposed expert witnesses, psychologists Charles Brainerd, Ph.D., and Mary Lyndia Huffman, Ph.D. Specifically, defendant argues that the court erred in concluding that the testimony would have violated the jury's exclusive role in making credibility determinations. He contends that the testimony was relevant and highly probative regarding the reliability of the complainants' accusations and that the exclusion constitutes reversible error.

Trial judges are given broad discretion when determining the admissibility of expert testimony. People v. Enis, 139 Ill. 2d 264, 290 (1990). Generally, an individual may testify as an expert if his or her qualifications display knowledge that is not common to laypersons and if the

testimony will aid the trier of fact in reaching its conclusion. Enis, 139 Ill. 2d at 288. An expert witness may provide an opinion on the ultimate issue in a case. People v. Terrell, 185 Ill. 2d 467, 496 (1998). The test is whether the opinion will assist the trier of fact to understand the evidence or to determine a fact in issue. "[T]he modern standard for the admissibility of expert testimony is not whether the subject is beyond the understanding of the jury, but whether the testimony will aid the jury's understanding. No higher standard applies to opinion testimony on an ultimate issue." Perschall v. Metropolitan Life Insurance Co., 113 Ill. App. 3d 233, 237 (1983). In exercising his or her discretion, the trial judge should carefully consider the necessity and relevance of the expert testimony in light of the facts in the pending case. Enis, 139 Ill. 2d at 290. When considering the reliability of expert testimony, the court should balance its probative value against its prejudicial effect. Enis, 139 Ill. 2d at 290.

After the witnesses were excluded, defendant submitted Dr. Huffman's report and Dr. Brainerd's testimony in an offer of proof. On appeal, defendant argues that both experts were improperly excluded, but he focuses on Dr. Brainerd's proposed testimony. Dr. Brainerd testified in the offer of proof that he has conducted extensive research on false memories and proper techniques for interviewing children who allege sexual abuse. He has been accepted as an expert by numerous courts in the country, including in Illinois, where he was accepted as an expert in memory, false memory, interviewing, and memory suggestion pertaining to the reliability of a complainant's accusations and of statements made by a defendant. Dr. Brainerd has testified in court 30 to 50 times, mostly concerning child sexual abuse, child memory, suggestibility, and reliability.

In this case, Dr. Brainerd reviewed numerous materials, including the investigative and police reports and eight complainants' videotaped statements. He opined that the complainants' statements

were unreliable, based upon: (1) the absence of any reliable confirmatory evidence (e.g., no statements by reliable adults, teachers, or parents that they had observed certain behaviors or conditions that could make the events possible); (2) the existence of disconfirmatory evidence (e.g., objective factors that appear to be inconsistent with the allegations); (3) infantile amnesia (e.g., as to C.E., who reported events that allegedly occurred during a period of time when young children remember very little about the events in their lives); (4) delayed memory reports (e.g., most allegations did not refer to any recent events in the complainants' lives but, rather, to months and years prior); (5) falsification by suggestive questioning (e.g., memory is susceptible to falsification in the face of suggestive questioning, particularly as time increases from the alleged incident); (6) repeated tellings (e.g., the more one tells and retells a particular story, even without suggestion, it becomes increasingly infected with false information); (7) confirmation bias (e.g., when an interviewer possesses certain information that he or she should not have for an unbiased interview, the interview becomes hypothesis confirming, rather than fact gathering); (8) inconsistency in memory reports (e.g., major inconsistencies regarding central features of the allegations); and (9) improper interview techniques (e.g., leading and suggestive questions instead of allowing for free narrative; steering away from innocent constructions of events or other possible interpretations; asking how the complainants felt about defendant; congratulating them on a job well done; using phrases such as "inside vagina," "outside vagina," "under leotard," "over leotard," before the girls did; multiple choice, yes-no, and fill-in-the-blank questions instead of open-ended questions).[4]

---

[4] Our review of Dr. Huffman's report reveals that the gist of her opinion is similar to Dr. Brainerd's. She concludes that "there is a high likelihood of tainting of the recall of the alleged victims in [this case]. This likelihood is affected by the pre-interviewing process, the tainting during

Dr. Brainerd further explained that it was significant that, after C.E.'s allegations came out, but before the other allegations, police approached and interviewed defendant and the gym's staff in a highly visible investigation and, in the process, falsely reported that defendant had confessed to C.E.'s allegations. This contributed to "mass suggestion," where other individuals had time to think and talk about the allegations, perhaps leading to false memory. Dr. Brainerd explained that this had multiple effects.

First, he noted that C.E.'s allegations differed greatly from those of all the other girls in that she described being removed from the main gym and described acts involving defendant's penis. In contrast, the other girls, who came forth with their allegations at least 10 days after hearing of C.E.'s allegations, described incidents that allegedly occurred in situations and an environment that was very close to their reality--i.e., defendant touching them while stretching or spotting them. According to Dr. Brainerd, the mind does not have to move very far to create a false memory that mimics reality.

Second, Dr. Brainerd opined that two complainants, A.P. and K.G., demonstrated prominent acts of "reconstructive retrieval." This occurs when a person does not have a clear memory of something but, as the subject is pondered, the memory fills in imagined details that fit the situation, which themselves become more real to the individual. Both girls initially stated that nothing had happened to them and signed affidavits to that effect. Approximately 18 months later, their memories changed. Each alleged, "I didn't think it happened to me, I didn't believe it, then I realized

the interviews, and post-event information. Therefore, the reliability of the recall of these young women concerning the alleged events is highly unreliable within a reasonable degree of psychological certainty."

it did happen to me because I was hearing about it, it happened to the other girls, and I know the other girls don't lie." Dr. Brainerd explained that these statements actually describe reconstructive retrieval and that this process, where one remembers something better as time goes by, is the precise opposite of normal memory, where one remembers less as time progresses.

Dr. Brainerd explained that these issues are not within the common knowledge of an ordinary juror because most of the findings grow out of scientific literature, many seem to conflict with what common sense suggests (e.g., most people would not realize the significance or import of repeated tellings), and the average person does not know about forensic interviewing protocols. Dr. Brainerd specified that he was not opining on the complainants' credibility--for example, whether a witness was telling the truth or lying--which he agreed was a determination for the trier of fact. Instead, he explained that his testimony went to the reliability of the statements--where a witness testifies to facts that he or she believes are true but that might be the product of mistaken belief, misrepresentation, suggestion, or another outside influence that might cause memory distortion. In other words, Dr. Brainerd explained, his opinions pertained to whether suggestion had affected the accuracy of the complainants' statements.

The trial court excluded the testimony. It noted that Dr. Brainerd sought to testify to the reliability of the complainants' statements by applying his research to the facts of this case. Similarly, Dr. Huffman applied her research to the facts of this case to indicate that the complainants' in-court testimony might be unreliable. The court found that this "sounds strikingly familiar" to Enis, 139 Ill. 2d 264, where the supreme court cautioned against the overuse of expert testimony. The trial court stated, "You can call it reliability. You can call it credibility. It is, in my opinion, absolutely an invasion of the province of the fact finder to let in the entirety of these reports and

entirety of these opinions." (Emphasis added.) The court found that some of the factors upon which the doctors based their opinions, such as what the complainants knew or heard before making their allegations, whether there was corroboration or conflicting information regarding the allegations, and the number of interviews or inconsistencies, could be brought out on direct or cross-examination. The court determined that these factors are common credibility issues. Relying on People v. Wilson, 246 Ill. App. 3d 311 (1993), where, according to the trial court, a doctor was not permitted in a child sexual abuse case to testify based upon his research and statistical analysis, the court ruled that Illinois courts do not allow experts to testify to the reliability of child victim testimony, because it invades the province of the jury.

The trial court determined that the only valid issue was whether limited expert testimony in the area of proper interview techniques should be permitted. According to the court, the testimony would apply only to the documented, forensic interviews of some of the complainants. The court noted a concern that it would be opening the door to a battle of the experts and a trial within a trial. It concluded that police officers' taking statements, having knowledge of facts from other witnesses, and asking suggestive questions are not outside the realm of the common experience of a lay juror and could be pointed out at trial.

After hearing Dr. Brainerd's testimony in the offer of proof, the trial court denied defendant's motion for reconsideration and again noted that Enis held that permitting an "eminently qualified physician" to testify regarding psychological issues of eyewitness testimony "and the reliability, not credibility, of eyewitness testimony" was not appropriate. The court noted that Dr. Brainerd would be testifying about reliability, based upon averages of accuracy of many people, as opposed to credibility, dealing with one individual, and that he would seek to use science to clear up some

misconceptions that a juror may have in this area. However, the trial court found that Enis instructed that it was not permissible to allow this type of testimony.

We believe that the trial court read the holdings in Enis and Wilson too broadly. Enis addressed eyewitness identifications. In that case, the defendant sought introduction of an expert to discuss the reliability of eyewitness observations. The supreme court upheld the exclusion of the expert, concluding that the expert would not have aided the trier of fact in reaching its conclusion. Enis, 139 Ill. 2d at 288. Specifically, the expert would have testified about general misconceptions that people have regarding eyewitness testimony. However, the court determined that none of those misconceptions were applicable to the eyewitnesses in the case. Enis. 139 Ill. 2d at 288. For example, the expert would have testified that witnesses to stressful situations have less accurate memories, although most people believe the opposite. But none of the eyewitnesses in the case witnessed any high stress situations. The supreme court affirmed the trial court's ruling and cautioned against the overuse of expert testimony, stating:

> "Such testimony, in this case concerning the unreliability of eyewitness testimony, could well
> lead to the use of expert testimony concerning the unreliability of other types of testimony
> and, eventually, to the use of experts to testify as to the unreliability of expert testimony. So-
> called experts can usually be obtained to support most any position. The determination of
> a lawsuit should not depend upon which side can present the most convincing expert
> witnesses. We are concerned with the reliability of eyewitness expert testimony [citations],
> whether and to what degree it can aid the jury, and if it is necessary in light of defendant's
> ability to cross-examine eyewitnesses. An expert's opinion concerning the unreliability of
> eyewitness testimony is based on statistical averages. The eyewitness in a particular case

may well not fit within the spectrum of these averages. It would be inappropriate for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable." Enis, 139 Ill. 2d at 289-90.

Thus, while the trial court here correctly noted that Enis strongly cautions against the overuse of expert testimony, we cannot agree with the court's conclusions that under Enis reliability is an inappropriate basis for expert testimony, that it is impermissible to allow reliability testimony that uses general statistics or science to clear up misconceptions about an area, and that Enis clearly bars the evidence here. Enis held only that the expert witness in that case would not have helped the trier of fact because the expert's testimony would not have addressed the situations pertinent to the case.

Similarly, the Fourth District in Wilson upheld the trial court's rejection of expert testimony in a child sexual abuse case, where the expert intended to testify generally regarding child victims' "proclivity to make [sex abuse] allegations only to please investigators and parents who, intentionally or unintentionally, subtly suggest what the child should say." Wilson, 246 Ill. App. 3d at 320. The court held that the proffered testimony would not have provided information beyond that of the average layperson because the limited cognitive abilities of children are well known. Wilson, 246 Ill. App. 3d at 321. Further, the court concluded that the testimony would have provided nothing more than generalizations that had nothing to do with the credibility of the child victims in the case. Wilson, 246 Ill. App. 3d at 322.

In People v. Simpkins, 297 Ill. App. 3d 668, 682-83 (1998), the Fourth District reversed the trial court's admission of expert testimony, finding that the State's expert's testimony regarding the frequency of and reasons for recantation by child victims of sexual abuse did not aid the jury in

reaching its conclusions and impinged upon the jury's province to determine credibility. Again, the expert's testimony did not address the situation before the court. The witness testified generally that a child victim recants his or her allegations due to an unsupportive family or to the child being blamed for the abusive parent's absence from the family. However, there was no evidence that the child victim at issue recanted because of an unsupportive family or because she felt like a scapegoat. Simpkins, 297 Ill. App. 3d at 683. The court concluded that, when stripped to its basic level, the expert's testimony constituted commentary on the child's credibility, similar to eyewitness expert testimony, and that, in essence, the expert was being asked to give his opinion on the believability of the child witness. Simpkins, 297 Ill. App. 3d at 683.[5]

Recently, the Fourth District affirmed a trial court's admission of an expert witness's testimony about sexual abuse victims' delays in reporting and piecemeal reporting due to feelings of shame. People v. Butler, 377 Ill. App. 3d 1050 (2007). The expert's testimony included opinions that the two sexual abuse victims in the case had exhibited delayed reporting; that one victim's reporting was piecemeal; that piecemeal reporting is often viewed by a layperson as a lie; and that the expert had no opinion as to whether the victims were believable. The court rejected the defendant's argument that the testimony improperly bolstered the victims' testimony and impinged

---

[5] Simpkins has been criticized. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §704.2, at 591 (8th ed. 2004) (to the extent that Simpkins holds that "expert witness opinion evidence explaining recantation by a victim of sexual abuse, which is the most significant part of the child sexual abuse accommodation syndrome, is an improper comment on the credibility of a witness and does not aid the jury in reaching its conclusion, it is incorrect and should not be followed").

upon the jury's function to determine credibility. Butler, 377 Ill. App. 3d at 1064-65. The court concluded that, unlike in Simpkins, the expert testimony found support in the testimony of the victims, who had delayed reporting, whose reporting was arguably piecemeal, and who had feelings of shame. Butler, 377 Ill. App. 3d at 1064. Further, the court determined that the expert's testimony did not constitute improper commentary on the credibility of the victims because--unlike in Simpkins, where the jury knew that the investigator had interviewed the victim, and the expert was presented in the State's case-in-chief--the expert told the jury that she had not spoken to either victim and that she had not made any determination as to whether they were credible. Butler, 377 Ill. App. 3d at 1065. Thus, "[the expert's] testimony aided the trier of fact, while leaving that trier of fact to determine the issue of credibility." Butler, 377 Ill. App. 3d at 1065.

We conclude that the trial court here abused its discretion by entirely excluding the experts' testimony. First, the trial court's readings of Enis and Wilson and its finding regarding defendant's ability to address these issues through cross-examination are erroneous. Enis, Wilson, and Simpkins found critical that the proposed experts spoke in generalities not applicable to the facts of those cases. That is not the case here. As the trial court noted, both Drs. Brainerd and Huffman not only opined about theoretical principles, but also applied the theories to the facts and circumstances surrounding the investigations of the complainants' allegations.

Second, we do not agree that all areas of the experts' proposed testimony either are within the common knowledge of an average juror or could have been addressed through cross-examination. It is highly doubtful that psychological concepts such as reconstructive retrieval, infantile amnesia, mass suggestion, and even forensic interviewing techniques for child victims of sexual abuse are within common knowledge. The trial court asserted that defendant could cross-

examine the complainants about what they heard and knew before they complained and what questions were asked by the investigators. In our opinion, cross-examination was not a substitute for the experts' testimony, because it merely elicited facts without helping the jury understand how those facts impacted the reliability of memory and, therefore, the complainants' statements.

Third, the trial court appears to have merged the concepts of reliability and credibility. Expert testimony is admissible where the expert speaks to his or her knowledge as applied to the facts of a case without improperly commenting on witness credibility, particularly where the expert has not spoken to the victims and testifies that he or she has not made any determination regarding credibility. Butler, 377 Ill. App. 3d at 1065. Both factors are present here. Neither expert personally interviewed the complainants. Dr. Brainerd explicitly noted that he had no opinion regarding whether the complainants were telling the truth. Rather, he explained that his testimony pertained to whether the truth, as the complainants believe it, could have been impacted by the circumstances surrounding their statements and the forensic interviewing techniques. Likewise, Dr. Huffman stated in her report that she was not addressing the complainants' credibility or how believable the complainants may be but, rather, their reliability and whether the evidence is, in actuality, what it proposes to be.

The testimony here was relevant to whether the investigative techniques and the circumstances surrounding the allegations created distorted memories or misconceptions. In this case, with no physical evidence or third-party eyewitnesses, the testimony may have been helpful to the jury in deciding the issues. An expert witness may provide an opinion on the ultimate issue in a case because the "trier of fact is not required to accept the witness' conclusion and, therefore, such testimony cannot be said to usurp the province of the jury." People v. Terrell, 185 Ill. 2d 467, 497

(1998). Although the trial court hinted that the evidence would not be let in in its entirety, it did not separately assess the testimony on each issue and weigh its probative value against its prejudicial effect. See People v. Allen, 376 Ill. App. 3d 511 (2007) (refusal to allow an expert to testify regarding the reliability of eyewitness identification was reversible error where the trial court did not give serious consideration to the offer of proof, failed to conduct the requisite probative versus prejudicial balancing test in considering the admissibility of the expert testimony, and did not seriously consider the relevant parts of the proposed testimony). Thus, we conclude that the court erred in summarily excluding the expert testimony in its entirety. We remand for reconsideration of the experts' testimony, consistent with the thoughts expressed herein. In so doing, we express no opinion regarding which, if any, portions of the testimony are admissible.

### D. Lesser Included Offense Instruction

Defendant next argues that the trial court abused its discretion in refusing his proposed jury instructions and verdict forms that included the crime of battery (720 ILCS 5/12--3 (West 2004)) as a lesser included offense of the charges. He contends that the error requires reversal.

We review for an abuse of discretion a trial court's refusal to submit a lesser included offense instruction. People v. Garcia, 188 Ill. 2d 265, 283 (1999). Generally, a defendant may not be convicted of an offense with which he was not charged. People v. Washington, 375 Ill. App. 3d 243, 248 (2007). A defendant may properly be convicted of an uncharged offense where: (1) the uncharged offense is identified by the charging instrument as a lesser included offense of the one charged; and (2) the evidence adduced at trial rationally supports a conviction of the lesser included offense. Washington, 375 Ill. App. 3d at 248. The purpose of an instruction on a lesser included offense is to provide the jury with a third option in the event it believes that the defendant is guilty

of something but is uncertain of whether the charged offense was proven and might otherwise convict rather than acquit the defendant of the greater offense. People v. Poulos, 303 Ill. App. 3d 818, 823 (1999), quoting People v. Hamilton, 179 Ill. 2d 319, 323-24 (1997). A lesser included offense instruction is required only when the evidence reveals that the jury could rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense. Poulos, 303 Ill. App. 3d at 823. A lesser included offense instruction is not required when the evidence shows that the defendant is either guilty of the greater offense or not guilty of any offense. See People v. Kerner, 183 Ill. App. 3d 99, 106 (1989).

Defendant argues that the trial court erred in refusing his battery instruction for each complainant. He argues that battery is a lesser included offense of aggravated criminal sexual abuse, as battery occurs if an individual commits an intentional or knowing touching without legal justification and by any means makes physical contact of an insulting or provoking nature. 720 ILCS 5/12--3 (West 2004). The State contends that the trial court's ruling was correct because no rational jury would have found that defendant touched the complainants' sex organs or breasts in a knowing, insulting fashion, but not for sexual gratification. We agree.

In Kerner, the court held that a lesser included offense instruction on battery was properly rejected in an aggravated criminal sexual abuse case where the defendant was either guilty of the greater offense or not guilty of any offense. Kerner, 183 Ill. App. 3d at 106. The defendant had argued that he did not touch the victims' sex organs or breasts, or, if he did, that the touching was unintentional. According to the court, if the jury believed the defendant's version, then its only conclusion would be that he was not guilty of any offense. "The only other possibility is that the touching was intentional. If there was an intentional touching, under the evidence presented, the

touching of the victims' sex organs or breasts could only have been for sexual gratification. Thus the defendant would have committed aggravated criminal sexual abuse, not merely battery." Kerner, 183 Ill. App. 3d at 106.

Defendant distinguishes Kerner by arguing that, under the facts here, he, as a gymnastics instructor, was required to touch the complainants' bodies to spot them, align them, and shape them during their exercises, whereas the defendant in Kerner had no reason to touch the complainants. Thus, there was evidence in the record where the jury could have found that defendant did not touch the complainants on their sex organs or breasts, but instead touched them in other areas, such as their thighs or stomachs, in an offensive way. We disagree. Clearly this conduct is not covered by the charging instrument. If the jury found defendant guilty only of touching the complainants in areas other than their sex organs and breasts, he would have been acquitted of the charges.

We find Poulos instructive. There, the defendant was charged with criminal sexual assault for penetrating the complainant's vagina with his finger. The evidence showed that the defendant had also touched the complainant's thigh. On appeal, the court rejected the defendant's argument that a lesser included offense instruction was required based on the touching of the thigh, holding that the indictment clearly did not describe a battery premised on an insulting or provoking touching of the thigh. Poulos, 303 Ill. App. 3d at 824.

> "To accept defendant's argument would be to accept that a charge of criminal sexual assault includes an insulting or provoking touch anywhere on the body, despite the limited description of the charge. This is an absurdity. *** If defendant touched [the complainant] on the thigh, he could have been charged with a separate offense of battery and could have

been convicted of both criminal sexual assault *** and battery ***." (Emphasis in original.) Poulos, 303 Ill. App. 3d at 824.

Defendant's reliance on People v. Margiolas, 117 Ill. App. 3d 363 (1983), where the court held that battery was a lesser included offense of rape, is misplaced. We do not agree with defendant's contention that it automatically follows that he is entitled to a lesser included offense instruction on battery. As the Poulos court noted, critical to the court's holding in Margiolas was the fact that the insulting touching alleged as a battery was the same act charged in the rape indictment. Poulos, 303 Ill. App. 3d at 824. Here, as in Poulos, defendant asserts that the insulting touching that would support a battery instruction involved different parts of the body than those mentioned in the indictment. Under the rationale in Poulos and Kerner and under the facts of this case, if the jury found that defendant did not touch the complainants' sex organs or breasts, then it would have found him guilty of nothing. We do not hold that a lesser included offense instruction on battery is never proper in a case of aggravated criminal sexual abuse. Rather, we find that, under the facts of this case, the trial court properly refused the lesser included offense instruction.

### E. Videotapes and Visit to Gym

Prior to trial, defendant moved the court to have the jury visit the gym and to conduct limited testimony there. The court denied the motion, finding that the gym was under the control of defendant's family and that it had been altered by the installation of security cameras subsequent to the allegations. At trial, the State was permitted to play a videotape of the gym with no classes, students, parents, or coaches present. Defendant's attempt, after the trial had begun and witnesses had already testified, to introduce a videotape of the gym with children attending classes was denied, and the trial court apparently found that the videotape violated discovery and was a "staged

photograph." The State's videotape was given to the jury for its deliberations, with other admitted evidence. Together, defendant claims, these trial court decisions distorted the jurors' perception of the alleged crime scene and were contrary to the evidence at trial that the gym was active and occupied by many people during the alleged crimes. He notes that the complainants alleged that he committed acts inside the facility with potential witnesses present and that his case "was premised upon his argument that it defied reality to believe the alleged conduct could have occurred without any corroborative witnesses, in an open crowded gymnasium with numerous children, coaches and parents looking on." Defendant contends that the cumulative effect of the court's refusal to permit the jury to visit the gym, its exclusion of his videotape of the gym, and its permission of the State's videotape of an empty gym precluded him from presenting his theory of the case and denied him a fair trial. He contends that the errors warrant reversal.

"While individual trial errors may have the cumulative effect of denying a defendant [the right to a fair trial], no such accumulated error occurs where none of the separate claims amounts to reversible error." People v. Dresher, 364 Ill. App. 3d 847, 863 (2006). We review for an abuse of discretion a trial court's decisions whether to visit a crime scene (People v. Durso, 40 Ill. 2d 242, 251-52 (1968)), to admit evidence (People v. Hood, 213 Ill. 2d 244, 256 (2004); People v. Caffey, 205 Ill. 2d 52, 89 (2001)), and to permit evidence to be viewed during jury deliberations (People v. Hunley, 313 Ill. App. 3d 16, 38 (2000)).

First, we consider defendant's request to transport the jury to the gym. It is not an abuse of discretion to deny a request to visit a crime scene when no useful purpose would be served by such a visit. People v. Gonzalez, 294 Ill. App. 3d 205, 214 (1998). "Photographs are often adequate to portray the scene for the jury." Gonzalez, 294 Ill. App. 3d at 214. While we would not go so far as

to say that <u>no</u> useful purpose would have been served by a visit to the gym, we cannot say that the trial court's decision to deny defendant's request was an abuse of discretion, particularly in light of its findings that: (1) the alleged crime scene was in the control of defendant's family; (2) there had been physical alterations (albeit minor) to the premises; and (3) there were 164 photographs and a videotape of the gym for the jury's review.

Defendant suggests that the minor changes to the gym could have been explained to the jury. Even so, the trial court found essentially that the visit was unnecessary because the photographs and videotape were adequate means of portraying the alleged crime scene. It appears that the photographs alone may have been adequate to portray the crime scene to the jury. Both the State and defendant prepared hundreds of photographs of the gym, and the photographs were heavily relied upon by both sides during trial.

In addition to photographs, there was also a videotape of the gym to show the jury the alleged crime scene. Defendant argues that the State's videotape was deficient because it failed to demonstrate the witnesses' positions relative to the locations of the alleged acts and that the videotape made the facility look like a "massive, empty, airplane hanger, which it was not." Further, he contends, the videotape showed compartmentalized views of the small rooms, rather than how one could see from one room into another. In contrast, he contends that his videotape was a more accurate portrayal of the crime scene than the State's because it showed how the gym looked during normal business hours.

Again, the decisions to admit the State's tape and to exclude defendant's were within the court's discretion. As to the State's tape, defendant was able to describe at trial the alleged inadequacies of the tape, and he repeatedly argued to the jury that hundreds of people were present

almost every day and during the alleged acts. We cannot say that admission of the State's tape was in error or, in light of the fact that it was used at trial and admitted into evidence, that allowing the tape into jury deliberations was an abuse of discretion.

Apparently, defendant's videotape was excluded because of a discovery violation and because the court considered it to be a "staged photograph." Neither side explains what the discovery violation was (although, since he moved to present the video after the trial had begun, we presume it involved late disclosure) or provides us with the court's actual ruling on this issue. Thus, without knowing the rationale behind the court's decision, we cannot say that it abused its discretion excluding defendant's videotape. Moreover, while we understand defendant's argument that a videotape of an empty gym, particularly when not balanced by a videotape of an occupied gym, presented a distorted view of the scene of the alleged crimes, we note again that defendant was able to effectively impress upon the jury that, on a daily basis, and, more importantly, on the dates at issue, the gym was highly active with people everywhere and that views were unobstructed. Accordingly, because we cannot conclude that any of the challenged decisions were in error, we cannot say that they cumulatively deprived defendant of a fair trial.

F. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to sustain his convictions. Accordingly, he seeks reversal.

Because we are remanding for a new trial, we must consider defendant's argument as to whether the evidence was sufficient to prove his guilt beyond a reasonable doubt. People v. Fornear, 176 Ill. 2d 523, 535 (1997). When a defendant challenges the sufficiency of the evidence supporting his or her conviction, the inquiry is whether, after viewing the evidence in the light most favorable

to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Collins, 214 Ill. 2d 206, 217 (2005). It is the function of the trier of fact to weigh and resolve conflicts in the evidence and draw reasonable inferences from the evidence. People v. Williams, 193 Ill. 2d 306, 338 (2000). We will not overturn a defendant's conviction as based on insufficient evidence "unless the proof is so improbable or unsatisfactory that a reasonable doubt exists as to the defendant's guilt." Williams, 193 Ill. 2d at 338.

Defendant acknowledges this standard, but contends that the evidence here was insufficient, particularly in light of the "logical inconsistency of the verdicts." He contends that each complainant was impeached, some severely and repeatedly, and that, despite the presence of numerous gym employees, students, and parents, no one observed any of the alleged misconduct. He contends that, as to C.E., A.P., S.H., A.S., S.O., and N.E., there was insufficient evidence of mere touching, because each witness testified that she was penetrated and the jury rejected their penetration testimony. However, C.E., A.S., A.P., and N.E. did not testify to any charged act where they were only touched. As to S.H. and S.O., their testimony regarding being only touched related not to the allegations of the charges, but to uncharged misconduct. Therefore, defendant contends that those convictions should be reversed because they are logically inconsistent. Moreover, he contends that each complainant lacked credibility. As to B.P. and A.S., defendant contends that his convictions of touching them on their sex organs and breasts should be reversed because their testimony lacked credibility.

We conclude that, viewed in the light most favorable to the State, the evidence was sufficient to sustain the convictions. Again, we will not reweigh the evidence or make credibility determinations. What defendant characterizes as the jury reaching inconsistent results may also be

characterized as the jury doing its job to carefully weigh the evidence and determine which testimony it deemed credible. Defendant's assertion that there was no testimony regarding mere touching is inaccurate. In addition to discussing penetration, the complainants testified that defendant slipped his hand under their leotards and "felt around," or "touched [the] vagina and moved his hand around," or "touched the skin" surrounding the vaginal opening, or "moved his fingers up and down." Also, the State presented a witness, Dr. Sangita Rangala, who testified regarding the anatomy of the female genitalia. In rejecting defendant's "illogical-verdict" argument on his motion to reconsider, the trial court noted that it presumed that the purpose of Dr. Rangala's testimony was to aid the jury in determining whether actual penetration occurred. We agree that there was sufficient evidence for the jury's conclusions and that, based upon this evidence, they were not inherently illogical.

Sufficient evidence for the verdicts was present. Even without the testimony of other crimes, the seven complainants' allegations as to the charges are inherently cross-corroborating. Moreover, both S.O. and S.H. testified about an incident where defendant touched S.H. inappropriately during a press handstand, and N.E. testified that she believed she saw defendant touching B.P. inappropriately. Thus, because we find that the evidence was sufficient to support the guilty verdicts, there is no double jeopardy impediment to a new trial. Fornear, 176 Ill. 2d at 535.

## IV. CONCLUSION

The judgment of the circuit court of Du Page County is reversed, and the cause remanded for a new trial.

Reversed and remanded.

BOWMAN and GROMETER, JJ., concur.