2020 IL App (1st) 182165-U

No. 1-18-2165

Order filed December 3, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CR 10806 |
| | ) | |
| DARREL WELCH, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hall and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions are affirmed over his contention that the trial court abused its discretion in admitting unduly prejudicial and excessive other-crimes evidence.

¶ 2    After a jury trial, defendant Darrel Welch was convicted of three counts of aggravated criminal sexual assault and one count of aggravated kidnapping and was sentenced to a total of 72 years in prison. On appeal, defendant contends that the trial court abused its discretion in allowing the State to present evidence that he committed a prior, uncharged sexual assault against

a different victim. In particular, defendant argues that the probative value of the other-crimes evidence was substantially outweighed by the danger of unfair prejudice because the prior assault was too remote in time and factually dissimilar from the charged offenses. He further argues that the State relied excessively on the other-crimes evidence at trial and thus created an improper "mini-trial" on that uncharged conduct. For the reasons that follow, we reject defendant's contentions and affirm the trial court's judgment.[1]

¶ 3                                    I. BACKGROUND

¶ 4     As will be discussed more fully below, the evidence at trial established that, in the early hours of June 3, 2014, as the victim, T.C., was walking home, defendant approached her from behind, grabbed her by the neck, and dragged her into an alley, where he ripped off her clothing, threatened to kill her, and repeatedly sexually assaulted her. At the time, defendant was 54 years old and T.C. was 19 years old.

¶ 5     Before trial, the State filed a motion to admit evidence that defendant committed a similar sexual assault against a different victim, T.B., in August 1999. In the motion, the State represented that, during that incident, defendant approached T.B., grabbed her by the arm, and forced her into an alley, threatening to hurt her if she screamed, before tearing off her clothing and sexually assaulting her. Finding the alleged assaults of T.B. and T.C. sufficiently similar, the trial court allowed the State to introduce the other-crimes evidence for purposes of showing defendant's intent and propensity to commit the charged offenses against T.C.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 6    At trial, T.C. recounted that, as she was walking home from a friend's house on the evening of June 2, 2014, she ran into another friend named Mike Noel. (Noel is defendant's nephew.) T.C. and Noel went to Noel's grandmother's house, where they sat on the front porch, talking and smoking marijuana. Eventually, T.C. and Noel went to the garage behind Noel's grandmother's house and had sex in a car parked in the garage. T.C. testified that Noel did not put his hands on her neck while they were having sex. When they finished, T.C. and Noel went back to the porch.

¶ 7    Around 1 a.m., Noel went inside the house while T.C. remained on the porch. At some point, defendant and a woman approached the porch and used a key to enter the house. Defendant later came back out to the porch and smiled at T.C. but did not say anything. T.C. then got up and began to walk home.

¶ 8    As T.C. walked toward an alley, defendant grabbed her and told her not to scream. With his hands around T.C.'s neck and mouth, defendant dragged T.C. down the alley, threatening to kill her if she was not quiet. When defendant got T.C. near the back of a garage, he pulled off T.C.'s clothes and pushed her to the ground. He then forced his penis into T.C.'s mouth, causing her to vomit. He proceeded to force his penis into T.C.'s vagina and anus. T.C. struggled to escape, but defendant wrapped his legs around hers and trapped her under the weight of his body. When defendant finally let T.C. go, he told her "what happens in Vegas, stays in Vegas," and that he would kill her if she told anyone what he had done.

¶ 9    T.C. got up and ran home, leaving her bra and underwear behind. When she arrived home around 5 a.m., she told her mother that she had been raped. T.C.'s mother testified that T.C. was hysterical and crying. Her hair and clothing were disheveled, as though she had been in a struggle.

After speaking with her mother, T.C. called 9-1-1. Two police officers and an ambulance arrived a short time later.

¶ 10    The ambulance transported T.C. to a hospital, where she was examined by a physician and nurse and a sexual assault kit was collected. The examination revealed bruising on both sides of T.C.'s neck, an abrasion on the palm of her right hand, and blood with yellow discharge inside her vaginal wall. T.C. reported pelvic and vaginal pain. The doctor and nurse collected oral, vaginal, and anal swabs from T.C., as well as swabs of her neck, breasts, and abdomen. The nurse noted the presence of dirt or debris in T.C.'s pubic hair.

¶ 11    Meanwhile, the police officers who responded to T.C.'s 9-1-1 call searched the alley where T.C. reported that the assault occurred. The officers found a bra, underwear, and pair of socks on the cement in front of a garage door between two garbage cans. The bra matched the description of T.C.'s bra. When shown a photograph of the bra at trial, T.C. identified it as hers. When the officers located the bra, they observed dirt in one of the cups.

¶ 12    Approximately two years later, T.C.'s sexual assault kit was tested. A forensic scientist identified a male DNA profile from the abdomen, breast, and neck swabs taken from T.C. A CODIS (Combined DNA Index System) search revealed that the male DNA profile matched defendant's DNA. T.C. subsequently identified defendant in a photo array and defendant was arrested. The DNA match was then confirmed through testing of a buccal swab collected from defendant after his arrest. The DNA profile identified from defendant's buccal swab was also found to match DNA identified on T.C.'s oral and anal swabs.

¶ 13    The State called two witnesses to testify about defendant's earlier sexual assault of T.B. Before each witness took the stand—and again at the close of the case—the trial court instructed

the jury that the other-crimes evidence was being admitted solely on the issues of defendant's intent and propensity to commit aggravated criminal sexual assault and could be considered by it only for those limited purposes.

¶ 14    T.B. testified that she had been drinking and getting high when, around 3:15 a.m. on August 26, 1999, defendant approached her on the street. Defendant told her that he had crack cocaine and asked her if she had something to smoke it with and if she knew of a place where they could go to get high. T.B. responded that she had a crack pipe and directed defendant to a nearby park. The park was located along CTA tracks, near a cemetery, and was "pretty isolated." When they arrived at the park, defendant asked to see T.B.'s crack pipe. She handed it to him, and he looked at it and handed it back. Defendant reached into his pocket like he was going to retrieve his drugs, but he instead punched T.B. in the eye, dazing her and causing blood to run down her face. Defendant then told T.B. to get undressed and got on top of her on the ground, forcing his penis into her vagina. He told T.B. that he was going to "fuck [her] all night." T.B. struggled to get away and was eventually able to escape by hitting defendant with the crack pipe. Wearing only her shirt, she ran across the park toward an alley, where she flagged down a police car.

¶ 15    The State also called one of the police officers that T.B. flagged down. The officer testified that he and his partner were on patrol when they observed T.B. walking toward them quickly. T.B. was naked from the waist down and her breasts were exposed through her torn shirt. She was bleeding from a cut over her right eye. The officer got out of his vehicle and spoke with T.B., who reported that she had been sexually assaulted. The officer went to the location where T.B. said the assault occurred and observed defendant behind some bushes, getting dressed. The officer detained defendant and brought him to the police vehicle, where T.B. identified him as her attacker. The

officers then transported defendant to the police station for questioning. Defendant admitted to having sex with T.B. but claimed it was consensual. He was eventually released and no charges were filed.

¶ 16    After the State rested, defendant took the stand. He testified that, around 1 a.m. on June 3, 2014, he was walking home with a female friend. As he approached his house, which he shared with his mother, sister, and two nephews, he saw T.C. sitting on the front porch. T.C. told him she was waiting for Noel. Defendant testified that, after his friend left, he and T.C. stayed on the porch and talked for about 30 minutes. He then decided to go inside, and T.C. asked if she could wait for Noel inside. According to defendant, he and T.C. then went to his bedroom in the basement and sat on the bed together and talked. Defendant testified that he put his arm around T.C. and kissed her, and that T.C. "cozied" up to him in response. According to defendant, he and T.C. then undressed and engaged in consensual sexual activity, including oral, vaginal, and anal sex, for about an hour. They remained in defendant's bedroom until about 3:30 or 4 a.m., when T.C. decided to leave. According to defendant, T.C. grabbed her belongings and the two went upstairs. T.C. put on her pants and shirt, but did not put on her bra, which she instead carried with her as she left. Defendant then went back downstairs and went to sleep.

¶ 17    Defendant also addressed the earlier incident with T.B. He testified that, when he encountered T.B., she asked him if he used drugs. Defendant told her that he did and asked her if she had a pipe. According to defendant, T.B. told him that she knew a place where they could go to get high. They then walked to a secluded area and proceeded to get high for nearly two hours. During that time, defendant testified, they engaged in consensual sexual activity. The activity ceased when defendant decided he wanted to leave. He grabbed T.B.'s crack pipe and tried to

make off with it, but T.B. resisted and a scuffled ensued. As they tussled over the pipe, defendant pushed T.B. into a wall, causing her to hit her head. T.B. then flagged down the police officers and defendant overheard her telling them she had been sexually assaulted. When an officer questioned defendant about what happened, he told the officer that he and T.B. had been getting high and had consensual sex. The officers handcuffed defendant and took him to the police station, but they eventually let him go without charges.

¶ 18    On cross-examination, the State first questioned defendant about his version of the incident with T.B., going through the details of defendant's account of his initial encounter with T.B., their drug use and allegedly consensual sex, the subsequent scuffle over T.B.'s crack pipe during which defendant allegedly pushed T.B. into a wall and caused the cut above her right eye, and defendant's ensuing interaction with the police. After questioning spanning approximately ten pages of the trial transcript, the trial court called a sidebar conference. The court explained that the State was entitled to cross-examine defendant about the description of his interaction with T.B. that he gave on direct examination, but the court reminded the prosecutor that the focus of the trial should remain on the charged incident with T.C. The court admonished the prosecutor to avoid turning the "other crime stuff" into a "[t]rial within a [t]rial." After the sidebar concluded, the State asked defendant two more questions about his encounter with T.B. and then turned its attention to the charged offenses. The latter portion of the State's cross-examination, addressing defendant's version of his encounter with T.C., spans approximately 20 pages of the transcript.

¶ 19    Finally, defendant called Noel as a witness. Noel testified that, while having sex with T.C. in the garage behind his grandmother's house, he put his hands around T.C.'s neck in a "rough" manner. He conceded, however, that he did not use enough force to hurt T.C. and that she looked

okay after their encounter. In addition, following Noel's testimony, the parties stipulated that, in an interview with an investigator from the State's attorney's office, Noel denied that he and T.C. had "rough" or "violent" sex and described it as "more like caressing."

¶ 20    In closing argument, the State stressed that the case boiled down to a credibility contest between defendant and T.C. and argued that the jury should believe T.C.'s testimony because it was corroborated by the physical evidence, including the injuries to T.C.'s neck and hand, the dirt in her pubic hair and bra, and the DNA evidence. The State also urged the jury to credit T.B.'s testimony about defendant's prior sexual assault of her. After reminding the jury that T.B.'s testimony could only be considered on the questions of defendant's intent and propensity, the State noted various similarities between the assaults that T.B. and T.C. described, including that both occurred late at night, in outdoor, secluded areas, that defendant and both victims were strangers, and that defendant used physical violence in both instances. In light of the similarities, the State argued, T.B.'s testimony about defendant's prior sexual assault provided added support for T.C.'s account of defendant's assault against her.

¶ 21    The jury returned guilty verdicts on all counts. Defendant filed a motion for new trial, arguing (among other things) that the trial court erred in allowing the State to introduce other-crimes evidence. The court denied the motion. The court sentenced defendant to consecutive terms of 18 years in prison on each conviction and denied defendant's motion to reconsider the sentence. Defendant then filed a timely notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, defendant contends that the trial court erred in allowing the State to introduce evidence that he committed a prior, uncharged sexual assault against T.B. to demonstrate his intent

and propensity to commit the charged sexual assaults against T.C. In particular, he argues that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and that the State's allegedly excessive focus on the other-crimes evidence created an improper "mini-trial" on the uncharged conduct that denied him a fair trial. We review the trial court's decision to admit other-crimes evidence for an abuse of discretion. *People v. Chapman*, 2012 IL 111896, ¶ 19.

¶ 24    In general, evidence of a defendant's prior criminal acts is inadmissible to establish his propensity to commit a charged offense, although such evidence may be admitted for other purposes, including to prove the defendant's motive, intent, opportunity, knowledge, identity, *modus operandi*, or absence of mistake. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Section 115–7.3 of the Code of Criminal Procedure (725 ILCS 5/115–7.3 (West 2014)), however, creates an exception to that general rule in cases involving certain sex offenses. Under that provision, when a defendant is charged with an enumerated sex offense, including (as here) aggravated criminal sexual assault, evidence of the defendant's commission of another such offense may be admitted for its bearing on any matter to which it is relevant, including to prove the defendant's propensity to commit the charged offense. *Donoho*, 204 Ill. 2d at 176; 725 ILCS 5/115–7.3(b) (West 2014).

¶ 25    As with any relevant evidence, otherwise admissible other-crimes evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011); see *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010) ("Even if offered for a permissible purpose, [other-crimes]

evidence will not be admitted if its prejudicial effect substantially outweighs its probative value."). When weighing the probative value of other-crimes evidence against the danger that it will cause unfair prejudice, section 115–7.3 directs a trial court to consider three factors: (1) the proximity in time between the other offense and the charged offense, (2) the degree of factual similarity between the other offense and the charged offense, and (3) any other relevant facts and circumstances. 725 ILCS 5/115–7.3(c) (West 2014).

¶ 26    Defendant argues that his alleged sexual assault of T.B. was too remote in time and not sufficiently factually similar to the charged sexual assault of T.C. to be admissible as other-crimes evidence. As for proximity in time, T.B. testified that defendant sexually assaulted her in August 1999, around 15 years before defendant committed the charged sexual assault against T.C. Our supreme court has declined to adopt any "bright-line rule" governing when a prior offense is too old to be admitted as other-crimes evidence. *Donoho*, 204 Ill. 2d at 183-84. Instead the court has explained that a prior crime's remoteness in time from the charged offense is simply one "factor to consider" when assessing the probative value of the other-crimes evidence. *Id.* at 184. Indeed, in *Donoho*, the court held that "while the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient" to render evidence of the prior offense inadmissible. *Id.* There, the court concluded that, despite the 12 to 15 years that elapsed between the other offense and the charged offense, the "substantial factual similarities" between the offenses were "sufficient to justify admission of the other-crimes evidence." *Id.* at 186.

¶ 27    We thus turn to consideration of the second factor specified in section 115–7.3, the degree of factual similarity between the other offense and the charged offense. Defendant contends that his alleged prior sexual assault of T.B. lacks sufficient factual similarities to the charged sexual

assault of T.C. to justify admitting evidence of the former offense as other-crimes evidence. We disagree. Our review of the record reveals numerous and significant factual similarities between the two offenses. Both assaults occurred in the early morning hours and in secluded areas. T.B. testified that defendant attacked her around 3:15 in the morning, after the two went to an isolated park to use drugs. T.C. similarly testified that defendant attacked her in an alley shortly after 1 a.m. There was also evidence that neither T.B. nor T.C. was acquainted with defendant prior to their respective assaults. In addition, defendant used physical violence to commit both sexual assaults. He sucker punched T.B. in the eye, dazing her and causing blood to run down her face. And he grabbed T.C. by the neck and dragged her with such force that it caused both sides of her neck to bruise. Finally, both offenses involved acts of forcible sexual penetration. T.B. testified that defendant forced his penis into her vagina, while T.C. testified that defendant forcibly penetrated her mouth, vagina, and anus with his penis.

¶ 28    Defendant discounts the similarities between the sexual assaults on T.B. and T.C. and focuses instead on the presence of certain dissimilarities. He notes that, while T.C. testified that defendant approached her from behind, dragged her into an alley, and threatened to kill her, T.B. did not describe similar actions by defendant. Instead, T.B. testified that defendant approached her on the street and asked if she knew where they could go to get high. And though T.B. testified that defendant punched her after she showed him her crack pipe, she did not recount any threats from defendant or testify that he grabbed her from behind and dragged her to the site of the assault. But "[t]he existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical." *Donoho*, 204 Ill. 2d at 185. Instead, where other-crimes evidence is offered, as here, for a purpose other than establishing

*modus operandi*, "mere general areas of similarity will suffice to support admissibility." (Internal quotation marks omitted.) *Id.* at 184. Despite certain differences in the methods defendant used to carry out the respective assaults, we think the substantial general areas of similarity described above are sufficient to support the trial court's decision to admit the other-crimes evidence for purposes of establishing defendant's intent and propensity, notwithstanding a 15-year gap between the offenses.

¶ 29    Relatedly, defendant complains that, in its pretrial motion to admit the other-crimes evidence, the State described defendant's assault of T.B. in a manner that differed in several respects from what T.B. ultimately described at trial and gave the impression that the assault of T.B. was more akin to the charged assault of T.C. than it actually was. In particular, the State proffered that defendant grabbed T.B. by the arm, forced her into an alley, and threatened to hurt her if she screamed. At trial, however, T.B. gave a different account of the events leading up to defendant's sexual assault of her, which involved defendant asking her if she knew of a place they could go to use drugs and then sucker punching her after they arrived at that location.

¶ 30    But defendant did not ask the trial court to reconsider its pretrial ruling on the admissibility of the other-crimes evidence after T.B. testified. Nor did defendant raise the discrepancy between the State's pretrial proffer and T.B.'s trial testimony in his motion for a new trial. Defendant thus forfeited any argument that the discrepancy alone warrants reversal of the trial court's evidentiary ruling. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). Forfeiture aside, because (as explained above) the details of the sexual assault to which T.B. testified at trial were sufficiently similar to the details of the charged sexual assaults against T.C.

to support admission of the other-crimes evidence, defendant has not shown that he was prejudiced by the inaccuracies in the State's pretrial proffer.

¶ 31 Finally, defendant contends that the State relied excessively on the other-crimes evidence, creating an improper "mini-trial" or "trial within a trial" on that evidence. "Even when relevant and probative, other-crimes evidence must not become a focal point of the trial." (Internal quotation marks omitted.) *People v. Smith*, 406 Ill. App. 3d 747, 755 (2010). When "admitting evidence of other crimes to show propensity," therefore, "a trial court should not permit a 'mini-trial' of the other, uncharged offense[s], but should allow only that which is necessary to illuminate the issue for which the other crime was introduced." (Internal quotation marks omitted.) *Id.* Having reviewed the record, we cannot say that the State's reliance on the other-crimes evidence was excessive or denied defendant a fair trial.

¶ 32 To begin, the State presented evidence of a single, prior sexual assault. And it presented that evidence through the testimony of just two witnesses—T.B. and the police officer to whom she reported the assault. Before each witness testified, the trial court admonished the jury that testimony about defendant's assault of T.B. could be considered only for the limited purposes of assessing defendant's intent and propensity. T.B.'s testimony accounts for just over seven pages of the trial transcript. After answering a few introductory questions, T.B.'s testimony was limited to a description of her initial encounter and interaction with defendant, his subsequent sexual assault of her, and her contemporaneous report to the police. The officer's testimony spans an additional 12 and a half pages (although about two and a half of those pages are devoted to a sidebar conference) and focused on the officer's observations of and interactions with both T.B. and defendant in the aftermath of the assault. Neither T.B. nor the officer offered repetitive or

unnecessary details of the assault that were unrelated to the issues for which the other-crimes evidence was introduced, namely, defendant's intent and propensity to commit the charged sexual assaults against T.C.

¶ 33    Nor did the testimony offered by the other-crimes witnesses become a focal point of the trial or amount to an improper trial within a trial. As noted, the testimony of T.B. and the officer takes up less than twenty pages of the trial transcript. By contrast, T.C.'s testimony spans about 55 pages of transcript (excluding sidebars and other unrelated matters). And the State presented six other witnesses—and offered numerous stipulations—that also focused exclusively on the charged assaults against T.C. This was thus not a case in which an excessive volume of other-crimes evidence overwhelmed the evidence related to the charged offenses. Cf. *People v. Cardamone*, 381 Ill. App. 3d 462, 491 (2008) (finding that danger of unfair prejudice substantially outweighed probative value of other-crimes evidence where "the vast majority of the State's case consisted of other-crimes evidence.").

¶ 34    Nonetheless, defendant contends that the State improperly shifted the focus of the trial to the other-crimes evidence by over-emphasizing the prior assault of T.B. in its cross-examination of defendant and closing argument. We again disagree. The State's entire cross-examination of defendant covers approximately 30 pages of the trial transcript. Yet only ten of those pages are devoted to the State's questioning of defendant about the details of his assault against T.B. On direct examination, defendant denied T.B.'s allegations and offered an alternative version of their encounter, in which he claimed (as he did with respect to T.C. as well) that their sexual activity was consensual. As the trial court properly noted, the State was entitled to cross-examine defendant

on those points and we cannot say, when viewed in context of the full record, that its questioning crossed the line from appropriate to excessive.

¶ 35    The State was likewise entitled to discuss defendant's alleged assault of T.B. in closing argument. In doing so, the State reminded the jury that the other-crimes evidence could be considered only on the questions of defendant's intent and propensity and then appropriately addressed the similarities between the two assaults, which were relevant to establishing both of the permissible points for which the evidence was admitted. Considering the relatively limited nature of the other-crimes testimony presented in the State's case-in-chief, and the limiting instructions concerning that testimony that the trial court delivered both during trial and at the close of the case, we cannot say that the State's references to the other-crimes evidence when cross-examining defendant or in closing argument created an improper mini-trial on the uncharged conduct or otherwise raised a risk of unfair prejudice to defendant that substantially outweighed the probative value of the other-crimes evidence. For all these reasons, we conclude that the trial court did not abuse its discretion in allowing the State to present the other-crimes evidence.

¶ 36                                        III. CONCLUSION

¶ 37    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 38    Affirmed.